[Crim. No. 6862. In Bank. Aug. 2, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. JOSEPH RO-
SOTO, JOHN FRANK VLAHOVICH and DONALD
GLEN FRANKLIN, Defendants and Appellants.

A. L. Wirin, Paul M. Posner, Samuel Dreizen and Robert L. Corfman, under appointment by the Supreme Court, and Rice & Rice, David Rice and Samuel K. Rice for Defendants and Appellants.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Gordon Ringer, Deputy Attorney General, for Plaintiff and Respondent.

McCOMB, J.—These are automatic appeals from judgments of guilty of murder in the first degree setting the penalty at death.

On March 9, 1957, shortly after it was closed at 2 a. m., the bar of the South Seas Restaurant in Anaheim, California, was robbed by armed bandits. Defendant Rosoto (hereinafter referred to as ''Rosoto''), Michael Rosoto (Rosoto's half-brother, hereinafter referred to as ''Michael''), Thomas Wearen Jenkyn and Warren Bruce Larson were involved in the robbery. Michael and Jenkyn wore silk-stocking masks, while Rosoto wore a blue-black yachting cap. Larson was in the bar pretending to be drunk and let the others in. Louis Suboter helped plan the robbery.

Mr. Leslie Simpson, the owner of the bar; Fern Vanatta, a guest (who later became Mrs. Simpson) ; and Howe, Welch, and Allen, employees, were robbed, herded into another room, and locked up, after which the cash registers were rifled and the telephone ripped from the wall.

Jenkyn was apprehended and questioned about a series of other robberies, and at the time implicated Michael and Rosoto in the South Seas robbery. Rosoto was later charged with the armed robbery of Simpson, Howe and Allen at the South Seas bar, and his trial was set for April 20, 1959.

February 7, 1959, shortly after 3 a. m., Leslie Simpson was shot and killed as he returned home from the South Seas bar with his wife, who was seriously injured. According to the testimony of Mrs. Simpson, the killing was accomplished by a tall, thin man who wore a loose jacket, carried a big gun, and came running from the north side of their home after they had parked their car preparatory to going into the house. Mr. Simpson was shot through the chest; Mrs. Simpson's left arm was shot off at the wrist and her right arm was badly wounded.

Rosoto was acquitted of the armed robbery charges at his trial on April 20, 1959.

In the present proceeding Rosoto was found guilty of (1) murder in the first degree for killing Leslie Simpson, (2) conspiring with Michael, Suboter, Jenkyn and Larson to commit burglary and robbery of the South Seas bar in Anaheim, California, on March 9, 1957, (3) burglary of the South Seas bar, (4) kidnaping with intent to commit robbery (two counts), (5) perjury, and (6) conspiracy to obstruct and pervert justice by delaying, impeding and avoiding criminal proceedings instituted against him for the robbery; defendant John Frank Vlahovich was found guilty of (1) murder in the first degree for killing Leslie Simpson, (2) perjury, and (3) conspiracy to obstruct justice; and defendant Donald Glen Franklin was found guilty of (1) murder in the first degree for killing Leslie Simpson and (2) conspiracy to obstruct justice.

*Questions:* First. *Was there substantial evidence to establish the guilt of each defendant on the charges of which he was found guilty?*

*Yes.* ▮▮▮ In a criminal prosecution the weight of the evidence is for the jury to determine in the first instance; and if the circumstances reasonably justify its verdict, this court must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence. (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778].)

▮▮▮ Applying the foregoing rule to the facts in the present case, the record discloses as follows:

Rosoto participated in the South Seas bar robbery. Both Mrs. Simpson and Mr. Howe testified he was the unmasked bandit. The testimony of Mr. Simpson, which was read into evidence, also identified him as such. In addition, Larson, Suboter, Jenkyn and Michael testified that he had participated; and in a telephone conversation with Michael on March 4, 1960, Rosoto admitted his participation.

On February 6, 1959, Rosoto bought a plane ticket for Tacoma, Washington, departing on a plane which left Los Angeles at 12:30 a. m. February 7, 1959. The murder of Mr. Simpson and the mutilation of Mrs. Simpson occurred shortly after 3 a. m., while Rosoto apparently was airborne.

Michael was married in Seattle on February 7, 1959, at 6:30 p. m. There was a reception afterward in the Empire Way Community Club. Rosoto, however, did not attend the wedding.

A few days later Rosoto returned to California, and on April 20, 1959, was acquitted on the charges of robbing Simpson, Howe and Allen at the South Seas bar. At the trial Rosoto and Vlahovich testified that they were together the entire evening of March 8, 1957, and early morning of March 9, 1957; that from about midnight until 2 a. m. they were at the California Hotel; and that immediately thereafter they went to dinner at a home in Highland Park, remaining until some time after 4:30 a. m.

A few weeks after the trial Rosoto returned to Tacoma, accompanied by Vlahovich. The day after their arrival they talked with Michael at the plant where he was working. That night they went to dinner with Michael and his wife at a restaurant.

The next evening, according to Michael's testimony, while he and defendants were eating dinner at the Roma Café, Vlahovich laughed and joked with Franklin about how "this guy got killed" and stated that that was the way he was going to do things from then on. Vlahovich also indicated he was the driver of the murder car and said he had slumped down to make it seem as if he were Michael.

Michael further testified that Franklin said murder is "the easiest thing in the world to get away with; you can fly from one town to another, do what you have to do and get back."

He also testified that Rosoto made the following statements: "We had them people taken care of real good." "There was only four people that knew about it. And anybody that done any talking, we would know who it was." "That's the way

we are going to do things from now on. Anybody gets in our way, that's it.''

According to Michael's testimony, Rosoto had called him during April 1959 to collect witnesses. Michael then went to Captain Rouse, of the Seattle Police Department, again contacting Captain Rouse in May before and after Rosoto and Vlahovich returned to Tacoma.

Captain Rouse testified that Michael told him on the evening of May 13, 1959, that Rosoto and Vlahovich had just admitted to him at the Roma Café that they had been responsible for the death of Mr. Simpson.

On February 6, 1960, in a conversation with Michael at the Skyway Motel Rosoto said, regarding the Simpson murder: ''They'll probably indict me by the Grand Jury . . . murder is never over with.''

In addition, in his telephone conversation with Michael on March 4, 1960, Rosoto said: ''That's the way you go when you play the game. You don't play it for fun, you play for keeps. . . . No, that's just the start of it. I'm going to have to take care of about a half a dozen more one of these days.'' When asked if he had said this, he replied, ''I was just going along with the gag.'' Then he admitted, ''I could have, sir.'' Finally, he said, ''I just don't know if I said it in those words.''

During the course of the telephone conversation Rosoto also said, when Michael cautioned him to watch himself, ''I do, but I've got my boys to do my work.''

Michael further testified that at the wedding reception Franklin said that he had just returned from California and that Rosoto was trying to contact him (Michael).

He also said that during the first week in March 1960 Franklin told him that on the evening of February 6, 1959, he had flown to San Francisco, where Ralph Johnson boarded the plane; that they proceeded to Los Angeles and were met by Vlahovich; that they had a few drinks and then they all went out to ''this guy's'' house and waited a couple of hours for him to come home; and that Johnson then killed the man.

Barbara Hale testified that at Michael's wedding reception she heard Franklin tell three men that he had just flown to Seattle from California, had ''taken care of it for Joe,'' and they should watch the newspapers and they would see it.

She further testified that in May or June 1959 she saw Franklin at a tavern in Seattle and that he started bragging about things he had done and ''gotten away with.'' He first

mentioned robbery and then said that when he was in California in February, he had shot and killed a man and shot the arms off a woman. He also told her he had done it for Rosoto, who had paid him to do it.

In a conversation with Charles Harrelson, another inmate of the jail, while awaiting trial, Vlahovich offered to kill a man for $35,000. In assuring the inmate he was the man for the job, he said: "Well, there is this one. There have been several others and I haven't missed yet."

On September 11, 1957, Rosoto was injured in an automobile accident in Tacoma. He was driving the car of his attorney (Mr. Ursich) and was struck by a truck driven by one Hickman and was injured, spending 64 days thereafter in a hospital. Hickman testified that he was paid $500, and promised $5,000, to strike the car from the rear and that Rosoto and Vlahovich conducted the negotiations. Similar testimony was given by Michael. In the conversation with Michael at the Skyway Motel, Rosoto said that he had beaten his case by stalling.

This evidence clearly supports the inference that the accident had been arranged to prevent Rosoto's extradition to California. His attorney, now deceased, represented at the extradition hearing that Rosoto was not well enough to return to California, when, in reality, he had driven his family from Tacoma to California prior to that time.

The foregoing evidence was sufficient to sustain the verdicts as to each count upon which defendants were found guilty.

Second. *Was Franklin denied the right to counsel?*

*No.* Franklin contends that by refusing him a continuance of trial, the court denied him the effective services of court-appointed counsel.

The indictment was filed April 7, 1960. Franklin appeared without counsel April 11. Samuel Dreizen was appointed April 12 to represent him upon his arraignment and on April 15 was appointed to represent him throughout the proceedings.

On April 25 Franklin demurred to the indictment. His demurrer was argued and overruled April 29. He then made a motion under section 995 of the Penal Code, the motion being argued and denied May 6. On this date he pleaded not guilty and made a motion for a separate trial, which motion was taken under advisement.

The matter was set for trial May 23 over his counsel's representations that he needed until July to prepare his case. His codefendants had urged "as speedy a trial as is possible."

On May 12 Judge Shea denied Franklin's motion for separate trials and confirmed the trial date. On May 23 Franklin asked Judge Crookshank for a continuance. The motion was denied without prejudice, and the case was assigned to Judge Morrison for trial. Franklin then renewed his motions for a continuance and separate trials, which motions were denied.

Mr. Dreizen told Judge Shea on May 6 that his client's witnesses were in the State of Washington and he would be constantly engaged in trial or preparations for trial until May 23. He renewed his representations to Judges Crookshank and Morrison on May 23, explaining that although he had hired an investigator, there had been insufficient time either to complete the investigation or to subpoena the Washington witnesses.

Franklin was entitled as a matter of right to five days' preparation. (Pen. Code, § 1049.)

The selection of a jury began May 23 and ended July 12. The People began presentation of their case July 13 and rested August 3. Franklin's first witness testified August 23. From May 6, the day trial was set, to July 13, when testimony was first taken, over nine weeks had elapsed. From May 6 to August 23, when Franklin opened his case, over fifteen weeks had elapsed. Furthermore, on August 15 the trial was recessed until August 22 to enable Franklin's witnesses to fly in from Seattle.

Franklin received a vigorous and able defense. It is not now claimed, nor was it claimed upon his motion for a new trial, that he was unable to consult with counsel or that he was prevented from securing any witness whose testimony he wished to present or any physical evidence he wished to introduce. Of the nine persons mentioned to Judge Morrison on May 23 as prospective out-of-state witnesses, three were members of Franklin's family, one of whom did not testify. Of the others, all appeared except one Shryne, whose name was removed by stipulation from Franklin's formal request for their attendance.

In view of the foregoing, it is evident that there was no deprivation of Franklin's right to counsel. (*People* v. *Dorman,* 28 Cal.2d 846, 850 [1] [172 P.2d 686].)

Third. *Did the trial court err in denying Franklin's and Vlahovich's motions for separate trials?*

*No.* Franklin and Vlahovich were not entitled to separate trials as a matter of right. (Pen. Code, § 1098.)

Upon the face of the indictment the nine counts were properly joined, and it is not contended that they were not. There

was "a common element of substantial importance in their commission," Rosoto's participation in the South Seas robbery, and the joint effort to immunize him from prosecution.

The fact that Franklin was charged in only two of the nine counts, and Vlahovich in only three, did not entitle either to a severance. (Pen. Code, §§ 954, 1098; *People* v. *Chapman*, 52 Cal.2d 95, 97 [1] [338 P.2d 428].)

Count VI charged Franklin and Vlahovich with complicity in Simpson's murder. Count VIII charged Vlahovich with perjury as a witness at Rosoto's trial in April 1959. Count IX charged Franklin and Vlahovich with membership in a conspiracy to obstruct justice in Orange County, alleging among the overt acts the vehicle collision with Hickman on September 11, 1957, the murder of Simpson on February 7, 1959, and the respective perjuries of Rosoto and Vlahovich in April 1959.

In a separate trial of Franklin for murder and conspiracy, once there had been established the fact of the murder and the existence of the conspiracy, the People would have been entitled to prove not only Franklin's admissions to Barbara Hale and Michael, but the perjuries of his codefendants and the circumstances of the collision as well, for they involved acts and declarations of Rosoto and Vlahovich in furtherance of the original agreement. (Code Civ. Proc., § 1870, subd. 6; *People* v. *Weiss*, 50 Cal.2d 535, 563 [18] et seq. [327 P.2d 527] ; *People* v. *Calhoun*, 50 Cal.2d 137, 143 [2] [323 P.2d 427].)

Likewise, the People would have been entitled to prove Rosoto's participation in the South Seas robbery, not only to show the reason for the murder but also to show that Rosoto and Vlahovich gave false testimony at Rosoto's trial in April 1959.

Similar considerations apply to Vlahovich.

The trial court instructed the jury at the close of the trial, and admonished the jurors on many occasions during it, that evidence admitted against one defendant was not to be considered against the others. It must be presumed that the jury followed the court's instructions; we hold that the instructions were adequate to protect each defendant from the effect of evidence admitted against the others. (*People* v. *Isby*, 30 Cal.2d 879, 897 [19] [186 P.2d 405] ; *People* v. *Santo*, 43 Cal.2d 319, 332 [19] [273 P.2d 249].)

Franklin contends that his motion for a separate trial was unfairly decided. His original motion was made May 6, 1960, before Judge Shea. Although the judge had evidenced an inclination to allow Franklin a separate trial, he specifically stated that the matter would be set down for a joint trial

unless he ruled to the contrary. Counsel for Franklin knew that the deputy district attorney intended to file written opposition to the motion and that since the trial was set for May 23, the motion would be determined quickly. Although Franklin claims that the deputy's memorandum in opposition to the motions for severance contained questionable and misleading representations, which he had no time to answer, he has not indicated in his brief what they are.

No argument was presented on May 12, 1960, when Judge Shea denied the motion. In fact, the deputy district attorney was not even in court.

This contention of Franklin is clearly without merit.

■ Fourth. *Did Rosoto's acquittal of the charge of robbery of Simpson, Howe and Allen at the South Seas bar constitute a conclusive adjudication that he did not commit robbery at the bar, and was it prejudicial error for the trial court to withdraw from the jury the question of res judicata?*

*No.* In count I Rosoto was accused of conspiring with Suboter, Jenkyn, Larson and Michael to commit burglary and robbery at the South Seas. Count II accused him of burglary in entering the South Seas with intent to commit theft. Count IV accused him of kidnaping Mrs. Simpson to commit robbery. Count V charged him with kidnaping Mr. Welch to commit robbery. He was found guilty on all four counts. At the prior trial he had been acquitted of robbing Simpson, Howe and Allen.

Rosoto argues that the only question at his prior trial was that of his identity as the unmasked bandit; that the acquittal constituted a necessary determination that he was not the unmasked bandit and barred his prosecution upon counts II, IV and V; and that since the only physical activity alleged as an overt act in the conspiracy charge consisted of entering the South Seas bar and robbing its occupants, the acquittal also barred his prosecution upon count I.

Under the facts as alleged in the indictment and found by the jury, Mr. Simpson was killed to prevent his testifying at the trial and as an example and warning to others. The murder of Mr. Simpson and the mutilation of Mrs. Simpson, both of whom had identified Rosoto at the preliminary hearing, were clearly intended, under the finding of the jury, to be for the purpose of barring their identification of Rosoto at the robbery trial.

Proof of Rosoto's direct participation in the South Seas robbery was admissible under count VI charging him with the

murder of Simpson (to show motive), count VII charging him with perjury, and count IX charging him with a conspiracy to obstruct justice, in which the murder and the perjury were alleged as overt acts. With respect to these counts, it is therefore immaterial whether his acquittal of robbery barred his prosecution upon counts II, IV and V. With respect to the latter counts, a reversal of the judgment on them would serve no useful purpose in light of our affirmance of the judgment on count VI. (*People* v. *Chessman*, 52 Cal.2d 467, 496 [341 P.2d 679]; *People* v. *Wein*, 50 Cal.2d 383, 409 [42] et seq. [326 P.2d 457].)

In any event, however, there is no constitutional prohibition against the state's prosecuting different offenses at consecutive trials even though they arose out of the same occurrence, unless such a course would lead to fundamental unfairness. (*Hoag* v. *State of New Jersey*, 356 U.S. 464, 467 et seq. [78 S.Ct. 829, 2 L.Ed.2d 913].) Under the facts of the present case, no showing of fundamental unfairness has been made.

In the *Hoag* case the defendant, after being acquitted on charges of robbing three persons in a tavern, was indicted for robbing another person during the same occurrence. Under a New Jersey statute, each of the four robberies, though taking place on the same occasion, constituted a separate offense, and the United States Supreme Court held that under the facts of that case the defendant was not deprived of due process by consecutive trials. (P. 469 et seq.)

The defendant in the *Hoag* case contended that the sole disputed issue in the previous trial related to his identification as a participant in the robberies and that his conviction was therefore barred by collateral estoppel. Pointing out that the state had recognized the rule and considered its applicability to the facts of the case, the United States Supreme Court held that whether collateral estoppel is to be applied to successive prosecutions for the same act is a question for the state courts and does not involve a matter of federal due process. (P. 471 et seq.)

In support of his position that his acquittal in the prior trial barred his prosecution under the charge of conspiring to commit burglary and robbery of the South Seas bar, Rosoto cites *Oliver* v. *Superior Court*, 92 Cal.App. 94 [267 P. 764]. In that case the petitioners had been charged with 33 counts of larceny and embezzlement and were acquitted by a jury, but the jury failed to agree upon a thirty-fourth count

charging conspiracy, in which the 33 thefts were the sole overt acts alleged. Prohibition was granted to prevent a retrial upon count 34, the court holding that acquittal of the substantive offenses was necessarily a holding that the petitioners were not guilty of conspiracy to commit those specific offenses.

*Oliver* v. *Superior Court, supra,* is not applicable to the facts of the present case, for the reason that in the instant case there were acts by five conspirators, and only the acts committed by Rosoto were in issue at the former trial. None of his confederates were tried at that time. Since it is sufficient that one conspirator commit one overt act, Rosoto's guilt of conspiracy would follow from proof that, pursuant to an agreement with him, any of his confederates entered the South Seas and committed the robbery. (*People* v. *Robinson,* 43 Cal.2d 132, 139 [10a] et seq. [271 P.2d 865].)

Fifth. *Was Mickey Sevester an accomplice?*

■ Rosoto requested the court to instruct the jury that Mickey Sevester was an accomplice of his as to counts I, II, IV and V. This request was denied.

The ruling was correct. Mickey Sevester was not one who was "liable to prosecution for the identical offense charged against the defendant on trial in the cause in which" her testimony was given. (Pen. Code, § 1111.)

She once handed Rosoto an envelope, upon which he drew a diagram of the South Seas. Upon an unspecified occasion she drove with Jenkyn (her husband) and Rosoto to the restaurant, and the latter pointed out the parking lot and the rest room window; and she picked up Jenkyn at Suboter's house after the robbery.

These activities, relied upon by Rosoto, did not establish her complicity as a matter of law. (*People* v. *Santo, supra,* 43 Cal.2d 319, 326 [1]; *People* v. *Means,* 179 Cal.App.2d 72, 85 [16], [17] [3 Cal.Rptr. 591].)

Since it could be inferred that she was not an accomplice to the robbery, and the question whether she was an accomplice was left to the jury under proper instructions, it must be presumed in support of the judgment that the jury found she was not an accomplice. (Cf. *People* v. *Santo, supra.*)

Sixth. *Was evidence of other crimes properly admitted against Rosoto?*

*Yes.* Evidence of Rosoto's complicity in 11 offenses other than the South Seas robbery was introduced for the purpose of establishing "a plan, scheme, system or design, into which

fitted the commission of . . . the conspiracy alleged in Count I of the indictment.''

Rosoto contends that the evidence was improperly received because the other crimes did not resemble the South Seas robbery and were proved by the testimony of his accomplices.

In a prosecution for conspiracy evidence of other crimes may be received if it tends to show the existence of a common plan or system of the accused. (*People* v. *Bompensiero,* 142 Cal.App.2d 693, 707 [6] [299 P.2d 725]; *People* v. *Darnell,* 97 Cal.App.2d 630, 634 [2] et seq. [218 P.2d 172]; *People* v. *Cossey,* 97 Cal.App.2d 101, 112 [4] [217 P.2d 133].)

The test of admissibility is whether the offense charged and the other offenses exhibit a common *modus operandi*; whether they do so is primarily a question for the trial court. (*People* v. *Baker,* 183 Cal.App.2d 615, 622 [7] [7 Cal. Rptr. 22]; *People* v. *Grimes,* 113 Cal.App.2d 365, 371 [3] [248 P.2d 130].)

Rosoto has incorporated in his brief a chart purporting to show the absence of significant similarities between the South Seas robbery and the other crimes. This chart, however, emphasizes insignificant points of divergence and does not point out the vital similarities.

For example, the ninth item on the chart shows that two of the three participants in the South Seas robbery wore silk-stocking masks, whereas masks were not worn during the other offenses. However, in seven of the robberies and burglaries make-up and/or chest padding was used as a disguise. Furthermore, Michael testified that in one of the other robberies stocking masks were used.

In each instance there was a conspiracy involving Rosoto and two or more accomplices. In all but one of the other robberies Rosoto provided the guns. In each instance there was either prior surveillance or ''inside'' knowledge or both. With only two exceptions, the establishments preyed upon were restaurants or markets. The robbers used their own cars or stolen cars or both. In most of the other cases the driver did not enter the premises.

Except for Larson, the ''inside'' man, the participants in the South Seas robbery had also participated in committing the other crimes. They constituted a well-organized gang, with Rosoto as their leader.

It is true that Rosoto entered the South Seas, but did not enter the other establishments. He explained, however, to

Mickey Sevester, "It is the first time I have gone in on one of the jobs in about ten years and I really had a ball."

It was not necessary for the People to prove Rosoto's complicity in each and every element of the other offenses beyond a reasonable doubt. It was merely incumbent upon the State to offer substantial proof. (*People* v. *Albertson,* 23 Cal.2d 550, 579 [8] [145 P.2d 7] ; *People* v. *Lisenba,* 14 Cal. 2d 403, 429 [7] [94 P.2d 569].) Rosoto claims that the only proof of his guilt consisted of accomplice testimony. Assuming that such testimony would have been insufficient to establish his guilt had he been charged with the other offenses, such evidence nevertheless constituted substantial proof, for had he been so charged it would have required only slight corroboration to sustain a conviction. (*People* v. *Griffin,* 98 Cal.App.2d 1, 26 [9] [219 P.2d 519].)

Seventh. *Was evidence of other crimes properly admitted against Vlahovich?*

*Yes.* Vlahovich was implicated in five of the other robberies and burglaries which were proved against Rosoto. The trial court on several occasions instructed the jury that this testimony was not offered against Vlahovich and was not to be regarded as evidence against him.

At the close of the People's case, however, the deputy district attorney made a motion "to expand the purpose" for which evidence of the other crimes had been admitted. He said: "I believe at the time those witnesses testified with relation to the activities in connection with a series of robberies that occurred in late 1956 and early 1957, that counsel interposed an objection that the evidence was not to be used against the defendant Vlahovich as to any offenses he was charged with, and I believe that at that time I agreed with counsel's statement.

"I have since re-examined my own position and the position of the law in regard to this and I am satisfied, your Honor, that the evidence of those witnesses in the matter in which it alludes to the activities of the defendant Vlahovich is material to the charge of perjury, only perjury, but is material to the charge of perjury in this indictment for this reason: The testimony of these witnesses establishes that the defendant Vlahovich was tied in, was connected with, was a party to a series of robberies that occurred—robberies, burglaries, thefts, whatever series of approximately a dozen that took place. He is not only [sic] on trial for any of those things but he is on trial for perjury. And it would seem to me that his association

with the defendant Rosoto is material to the issue of perjury. That is, how well did he know him? How closely tied to him was he? How closely connected to him was he? That would be material to the issue of the perjury charge.

"Similarly it would tend to establish a motive all his own to the charge of perjury in that it would show that the defendant Vlahovich had a reason for testifying falsely. He did not want the defendant Rosoto convicted because if other people came forward, if other people participated in a trial, it would involve him. Not necessarily in the South Seas, which we were concerned with in Rosoto's trial, but within the series—in the series of robberies and perhaps trials in other areas or in other counties on those charges.

"So that my motion, your Honor, and I make it only within mind that at an appropriate time your Honor would instruct the jury along this line, that that evidence is admissible against the defendant Vlahovich for the sole purpose of establishing what motive, if any, he had to commit perjury and to establish his relationship with the defendant Rosoto who was on trial in April of 1959 in the Superior Court in Orange County."

The motion was granted, and the evidence of Vlahovich's participation was submitted to the jury under an instruction limiting its purpose to whether it showed he had a motive to commit perjury in Rosoto's behalf.

Vlahovich contends that the court erred in granting the motion and argues that the evidence was inadmissible against Rosoto and himself and should not have been admitted at the close of the People's case.

We have pointed out above that the evidence was properly admitted against Rosoto. It likewise appears that it was properly admitted against Vlahovich to show that he had a motive to lie for his codefendant, Rosoto. ▮▮▮ Motive may be proved in a prosecution for perjury. (*Harris* v. *State of Georgia*, 69 Ga.App. 872 [27 S.E.2d 51, 52 [2, 3]].)

It cannot be doubted that if Rosoto was the leader of a gang of robbers and Vlahovich a member of the gang, there existed between them a bond of mutual interest and a desire for mutual security closer and more exacting than a bond of friendship.

▮▮▮ Vlahovich contends it was improper to grant the motion to expand the purposes for which the testimony had been admitted, since he had not cross-examined the witnesses at any length and did not have an opportunity to cross-examine them at all after the granting of the motion. He may not urge this proposition before this court, because at the time

the motion was granted he did not request that any of the People's witnesses be called for further cross-examination. Had he made such a request, we must assume the trial court would have granted it.

**Eighth.** *Was it proper for the district attorney to have the recordings of the Skyway Motel conversations played to the jury and then refer to them in argument?*

*Yes.* The People introduced in evidence, and played to the jury, two tape recordings comprising a February 6, 1960, conversation at the Skyway Motel between Rosoto and Michael, in which Joseph Rosato, a cousin of theirs, also participated.

Rosato testified that during the conversation Rosoto said to Michael: "The only time you ever contact me is when you are in trouble" and "Every time I help you I end up getting myself in trouble." Rosato had told the police that "Mike had run away and he wanted his brother to help him get out of a jam," and that "Mike stated that he didn't have any money, and Joe stated to him that the best thing for him to do was to go back to Seattle and give himself up."

Rosoto testified to the same effect, as follows: Michael told him he was involved in a robbery with Gino Pinto and Sonny Connors and needed his help; he told Michael he wanted no part of him and not to bother him any more and "it seemed like the only way I could make him understand me, that I wasn't kidding, I had to cuss at him all the time so he would understand the point that I didn't want nothing to do with him." He admitted telling Michael that he could keep Gino in line by threatening him with "that Western Union deal" and he guessed he said: "That is your weapon. Use it." He might also have told Michael that Chilfone was lucky he was not at the bottom of a creek somewhere. Rosoto's statements about Chilfone and using a "weapon" against Gino are in the transcription of the recordings.

Rosoto claims it was error to play the recordings because there was insufficient proof of their authenticity and because they were mainly unintelligible. He argues that there was no evidence to identify the voices and that the deputy district attorney committed misconduct in attributing in argument certain statements to particular speakers.

Sergeant Cook described the placement of a microphone and transmission pack under a bed in Michael's room at the motel on the night of February 5, 1960, and a receiver and recording and monitoring equipment in an adjoining room occupied by

himself, Moyle and other officers. About 8:30 a. m. on the 6th, Cook observed Rosoto arriving in the company of a man he later learned was Rosato, and the recorder was turned on. Two tapes were recorded. Rosoto and Rosato left Michael's room, and Michael entered the room occupied by the officers. Michael then went back to his own room, whereupon Rosoto returned alone.

Cook was shown the tapes, testified that he had listened to them, and described them, to the best of his knowledge, as true and accurate reproductions of the conversations and activities that took place in Michael's room. Over Rosoto's objection to their introduction upon the ground of improper foundation, the court admitted them in evidence.

Upon cross-examination, Cook testified as follows: The tapes had been in his possession four days; he could identify them only by hearing them; he first listened to them February 7 in the district attorney's office; he listened to them on two later occasions in the district attorney's office; and he did not know if they had been rerun and amplified, but he did not recall that they sounded louder the third time than they did the first.

The testimony of Cook was plainly sufficient to establish the accuracy of the recordings, the place where they were kept, and the absence of alterations and deletions.

It is obvious that the beginning of the conversation was difficult to comprehend, as is evidenced by the colloquy between the court, the jury, counsel, and the technician, set out in Rosoto's brief. However, after counsel had entered an objection that the recording was unintelligible, the court said: "Well, let's continue and see if we can't begin to work that into a little plainer as far as the voices are concerned. You go ahead." Counsel replied: "For the record, then, I assume the motion is overruled?" The court answered, "Yes, for the present."

Counsel's ensuing actions are highly significant. At one point during the playing of the second tape he objected that the conversation was immaterial and irrelevant, and after the tapes had been played he moved to strike them as immaterial, irrelevant and prejudicial. The court had overruled his initial objection "for the present," clearly contemplating that if the recordings were incomprehensible, the objection could be renewed and would then be reconsidered. However, it was never renewed. This failure to complain, together with counsel's assertion that what he had heard was prejudicial to his client,

must be deemed a concession that the recordings were sufficiently intelligible to be understood by the jury.

With the exception of the first 176 feet, which were not played to the jury, the first tape consists of conversation among Michael, Rosoto and Rosato, and the second of conversations between Michael and Rosoto. The jury had heard testimony from Michael and Rosato and was familiar with their voices. Knowing Rosoto was also in the room, they could identify his voice by a process of elimination. Rosoto has had no difficulty in identifying the voices in his brief.

When reading the statements to the jury, the deputy said that he was relying upon his own recollection and notes, but that what he was saying was not evidence and need not be accepted as evidence; and he expressly invited the jurors to replay the tapes. Had the jurors entertained any doubt that what the deputy said coincided with what they had heard, they would surely have done so.

Franklin contends that all references to him should have been stricken from the recordings. This contention is devoid of merit, since the court admonished the jury at the time that statements in his absence were not evidence against him, and a formal instruction to this effect was given. (*People v. Grace*, 166 Cal.App.2d 68, 75 [12] [332 P.2d 811].)

Ninth. *Was evidence of the telephone conversation on March 4, 1960, between Rosoto and Michael admissible?*

*Yes*. It was stipulated that with one immaterial exception the transcript was an accurate reproduction of a tape recording of the same conversation. Michael testified that he listened to the recording and "it was the same when I was talking to Joe over the phone."

On *voir dire*, Michael testified as follows: Captain Rouse was present when the conversation took place and the recording was made; the machine was already set up, and he did not know who operated it; no mark was made on the tape; and he had heard the tape and read the transcript. When asked whether he remembered "the complete conversation" and "all of the contents," he replied: "Not every little detail but I remember what I said." The transcript was read to the jury, and the recording was played during rebuttal.

Rosoto contends it was error to admit the transcript and the recording because there was insufficient proof of the latter's authenticity. This contention is devoid of merit, since Rosoto himself testified he made the incriminating admissions that appeared on the tape. He told his brother, "I am the guy that

did it,'' respecting the South Seas robbery, and ''They can't touch me with a ten-foot pole,'' respecting Simpson's murder; and his evasive answers constituted an admission that he had said: ''That's the way you go when you play the game. You don't play it for fun, you play for keeps'' and ''No, that's just the start of it. I'm going to have to take care of about a half dozen more one of these days.''

Franklin contends the court should have stricken the references to him from the transcript and the recording. This contention is devoid of merit. Although the references could well have been stricken, there was nothing in the conversation that Franklin had engaged in any criminal activity or was about to do so. Therefore, he could not have been prejudiced by the jury's hearing the statements. Under article VI, section 4½, of the California Constitution, any technical error in this respect must be disregarded.

Tenth. *Was evidence of Rosoto's automobile accident properly admitted?*

*Yes.* The People alleged in count IX, and proved upon the trial, that on September 11, 1957, Rosoto, while driving an automobile belonging to Ursich, his attorney, in Tacoma, was injured in a collision with a truck driven by one Hickman. Rosoto told Oxandaboure, an investigator for the district attorney's office, that his injuries prevented his returning to California to stand trial for the South Seas robbery until December 1958. Hickman testified that he was paid $500, and promised $5,000, to strike the car from behind and that Rosoto and Vlahovich conducted the negotiations. Michael gave similar testimony.

There can be no question that if the accident had been staged for the purpose of delaying Rosoto's extradition, it was properly pleaded as an overt act in the count charging a conspiracy to obstruct justice and properly shown upon the trial. There was evidence from which it could be inferred that the accident was legitimate or was staged in order to defraud Hickman's insurance company. However, those inferences were not the only reasonable ones to be drawn from the evidence.

September 10, 1957, the day before the accident, Ursich wrote to the Orange County authorities, and read to Rosoto, a letter offering to surrender him upon $3,500 bond without seeking a continuance of the extradition hearing set for September 20, 1957. It was not shown to the exclusion of all other tenable inferences that the collision was really accidental or that Rosoto arranged it merely to raise bail. In August of the

following year (1958) Ursich represented to Judge Shackleford in the final extradition hearing that Rosoto was physically unable to return to California, although he had actually driven his family from Tacoma to Hawthorne, California, in the month of June 1958. Further, in the Skyway Motel conversation in February 1960 Rosoto gave Michael the following advice as to his defense on a fictitious robbery charge: ''Here's the thing, Mike, be smart. You stay away long enough, they've got to try them guys.''

The foregoing evidence is sufficient to warrant an inference not only that Rosoto made use of the accident to delay extradition but that it was conceived and carried out for that purpose.

Eleventh. *Was the cross-examination of Rosoto proper?*

*Yes.* When the transcript of the March 4, 1960, telephone conversation was read in evidence, two passages were omitted on motion of the defense. In the first omitted passage, Rosoto told Michael he was waiting for a telephone call and then would make arrangements ''on the spur of the moment.'' In the second passage Michael said, ''You know the cops got my gun''; Rosoto said he would get one; Michael offered to get one; and Rosoto told him not to ''because you guys ain't going to travel with no heat on you.''

Upon cross-examination and over objection, the deputy district attorney called to Rosoto's attention the passage about obtaining guns. When asked whether he made the statement last quoted, Rosoto replied: ''Well, that answers the question, sir, Mr. Hicks, because there was three people there and they had to have a gun apiece——'' and when the question was repeated he replied: ''I believe so.''

Rosoto contends that it was error to permit cross-examination regarding the second passage, which had been stricken from the transcript. In view of his testimony on direct examination, however, the cross-examination was proper. He testified on direct that the telephone conversation had been prearranged, Michael told him what to say, and he understood Gino Pinto was listening in. He testified: ''He told me to tell Gino that there was a big future ahead, that there was going to be a big job going to be pulled, to promise Gino anything pertaining to crime, so he would leave Michael alone. And I went along with it. I lied.''

The jury had to choose between two interpretations of the conversation, the one which would naturally be placed upon it

by any rational person and the one advanced by Rosoto. It contained devastating admissions of his complicity in the South Seas robbery and the Simpson murder, and it was for the jury to determine whether they were legitimate or feigned, whether Rosoto made them for the purpose of protecting his brother from Pinto, and whether he made them knowing them to be true or believing them to be false.

If Rosoto's explanation was valid, the statements that he urges should not have been called to his attention on cross-examination were statements which, on direct examination, he said Michael told him to make. If Rosoto made the statements about the guns that he admitted making, his explanation that he was admitting his guilt of crimes he did not commit is reduced to hopeless absurdity.

Twelfth. *Was it proper to cross-examine Franklin about his acquaintance with Rosoto?*

*Yes.* Franklin contends that the court committed error in allowing his cross-examination upon matters untouched on direct. More specifically, he challenges the questioning about a statement he gave in Ursich's office in May 1959 and a conversation he had with Oxandaboure after his arrest.

Franklin's testimony on direct consisted almost entirely of a description of his activities on February 6 and 7, 1959, and of denials that he made to Michael and Barbara Hale the admissions that they attributed to him. He argues that it was improper to cross-examine him on other matters.

At the end of his direct examination, however, he was asked whether he killed Simpson and whether he had "anything to do with, participate[d] in, or in any way conspire[d] to obstruct justice as alleged in Count 9 of the Indictment." This he denied. Franklin having denied in general terms his guilt of conspiracy, as well as his guilt of murder, the scope of cross-examination was necessarily wide. (*People* v. *Sykes,* 44 Cal.2d 166, 171 [7] [280 P.2d 769] ; *People* v. *Zerillo,* 36 Cal. 2d 222, 228 [6] [223 P.2d 223] ; *People* v. *Williams,* 164 Cal. App.2d 285, 289 [4] [330 P.2d 942].)

The prosecution was entitled to ask questions designed to show that Franklin was acquainted with his coconspirators. Franklin was asked when he first met Rosoto, and replied that he first saw him "in the condition he is right now" in Ursich's office in May 1959. Then he was asked whether Rosoto was present when he and Michael gave a statement in Ursich's office, and he replied: "I don't know. I didn't—didn't—nobody said Joseph Rosoto was there. That

man there was there, though.'' Upon being asked, ''You don't know yet that he is Joseph Rosoto?'' Franklin replied: ''Well, he said he is Joseph Rosoto. I will believe him.''

Franklin was shown a document that was represented to him as a transcript of the statement he gave in Ursich's office, and although he admitted ''it sounds familiar,'' he recalled none of the questions he had been asked or the answers he had given.

Over objection, the questions and answers were read to him, and he was asked whether the statements he allegedly made were true. By this means the deputy elicited a narrative about the financial aftermath of the Hickman accident that did not implicate Franklin in the collision and did not involve him in Michael's machinations except as a spectator.

He was shown one question beginning, ''Let me ask you again just like Joe did . . .'' and was then asked whether anyone named Joe asked him any questions. He replied: ''I haven't the slightest idea.'' No doubt this line of cross-examination was designed to bring out the presence in Ursich's office of someone named Joe, i.e., Rosoto.

Franklin was then asked, ''That same person whom we now agree was Joseph Rosoto, he was in the office at the time this statement was given, wasn't he?'' Franklin replied: ''I said I believe so. I don't remember. I know it was—I forget what the answer was. I know it was a vague one anyway.''

 Since he had already admitted in a grudging and evasive manner that he saw Rosoto in Ursich's office in May 1959, further questioning calculated to draw the same information from him could not have harmed him.

 Franklin was also asked whether he and Oxandaboure had a conversation to which the latter had testified during presentation of the People's case. On April 12, 1960, Franklin entered the courtroom. As a police officer escorted him to the front, he passed Rosoto, who was sitting on the aisle, and touched him on the shoulder, saying to Oxandaboure after he sat down, ''Are you still trying to prove that I know Joseph Rosoto?'' When Oxandaboure pointed to Rosoto and asked, ''Have you ever seen that gentleman in the white sweater?'' Franklin replied in the negative. Franklin was asked whether he had asked the question of Oxandaboure, and he admitted having done so. However, he said that he saw Rosoto in the courtroom, and the person to whom Oxandaboure had pointed was Rosoto's attorney.

It is contended that the questioning was improper because

the answer given did not contradict Franklin's previous testimony. This contention is devoid of merit. Having testified evasively that he saw Rosoto in Ursich's office but did not know whether it was Rosoto whom he had seen, it was proper for the deputy to question him about conduct from which it could reasonably be inferred that he knew who Rosoto was.

Thirteenth. *Did the court err in admitting evidence of Michael's prior consistent statements?*

*No.* During cross-examination, Michael admitted robbing a market in Seattle on February 13, 1960, following the Skyway Motel conversation. At the time of trial, he was facing a charge of armed robbery. James Makos, a witness for Franklin, testified that in a conversation at the Hitching Post with Connors, Monson and himself, Michael said that ''he had a deal made'' with the Seattle Police Department; that ''he had his self to worry about now, pertaining to this Ralph's robbery''; that his testimony was false; and that he was willing to repudiate it.

In rebuttal and over objection, Captain Rouse testified that at 9:40 p. m. on May 13, 1959, Michael informed him over the telephone as follows: He had been with his wife, Rosoto and Vlahovich at the Roma Café; Rosoto and Vlahovich told him ''they had brought about the death of Mr. Simpson,'' but they gave him no details; and Rosoto and Vlahovich laughed and bragged about Mrs. Simpson's appearance ''without her extremities.''

Rouse's testimony was admitted for the limited purpose of rehabilitating Michael by showing that he made statements consistent with his testimony at the trial ''prior to any time or any indication of any pressure being put on the witness to make those statements at the time.''

Rosoto contends that the court erred in permitting Rouse to rehabilitate Michael, because Michael's statements were made at a time when he was controlled by motives of interest and bias, and the statements were inconsistent with his testimony at the trial.

It is settled that when the testimony of a witness has been assailed as being of recent fabrication, evidence of his statements or conduct prior to the claimed fabrication consistent with his testimony at the trial may be admitted under an exception to the hearsay rule, not to prove the facts of the case but to show that the testimony of the witness was not a fabrication and he was not controlled by motives of interest. (*People* v. *Walsh,* 47 Cal.2d 36, 41 [2] [301 P.2d 247].)

■ Fourteenth. *Was the testimony of Esther Resnick properly received in evidence?*

*Yes.* Raymond Allen died after Rosoto's robbery trial. Pursuant to stipulation, his former testimony was read in evidence as part of the latter's case. In rebuttal, Esther Resnick, the court reporter, testified that Allen shook visibly while testifying, and told her during recess and as he was leaving the stand: "I had to testify that way. I was threatened. They would have shot me."

The testimony of Mrs. Resnick was properly received for the purpose of impeaching Allen by proof of subsequent inconsistent statements. (*People* v. *Collup*, 27 Cal.2d 829, 836 [2a] [167 P.2d 714].) Allen's remark, as related by Mrs. Resnick, was inconsistent with the testimony he had just finished giving. Therefore, it was properly admitted.

Fifteenth. *Were Harrelson's testimony and the Harrelson-Vlahovich recordings properly received in evidence?*

*Yes.* Vlahovich contends that it was error to allow in evidence Harrelson's testimony regarding their conversations in the Orange County Jail and to permit tape recordings of their conversations of July 8, 14, 25, 28 and 30 to be received in evidence.

When Vlahovich was cross-examined August 15 about his statements to Harrelson, the deputy district attorney explained his theory of admissibility as follows: "Your Honor, if the evidence tends to show that this witness is available to kill for hire, I think that that would be a vital, a most important, inquiry for this trial for the benefit of the jury. It does contribute. We are not just talking about prejudice. It contributes to his guilt or innocence of these charges."

Harrelson testified, as a rebuttal witness, on direct, cross, and redirect examination during the afternoon of August 30 and the morning of August 31 with no opposition to his testimony other than scattered objections that certain answers were conclusional or unresponsive.

At the commencement of the afternoon session of August 31, Vlahovich made a motion to strike. The deputy said in opposing the motion: "The evidence that we have here is offered on the theory that it shows intent or state of mind which is always material to a charge of this character where intent or frame of mind is an issue." He also said: "The witness, Harrelson, has testified that Mr. Vlahovich on one occasion . . . in discussing the killing of this other person, Roy, that the defendant Vlahovich said 'Well, there was this one and there

was several others'—words to this effect—'Several others and I haven't missed yet.' Now, that is of course evidence that the People are entitled to introduce and we couldn't introduce it in a vacuum, anyway. We would have to introduce it under the circumstances in which that conversation came about." The motion was denied.

Harrelson's testimony was submitted to the jury under a People's instruction limiting its application to whether it showed Vlahovich was familiar with or possessed the means allegedly used in the Simpson murder, showed he possessed knowledge that may have been useful or necessary to its commission, and showed the circumstances under which he made admissions, if any, to Harrelson.

Harrelson testified as follows: He told Vlahovich he and an associate named Roy, who was in a federal penitentiary, had placed $197,000 in a safety deposit box in Rio de Janeiro. Vlahovich told him he would be foolish if he did not have Roy "rubbed out," and offered to split the money with him. He offered to kill Roy first for $47,000 and then for $35,000, half to be paid in advance, the remainder to be paid after the murder. When Harrelson asked Vlahovich if he thought he could take care of the job, Vlahovich replied: "Well, there is this one. There have been several others and I haven't missed yet." Vlahovich said he had a man in town whose fee would be $500 even if he did not kill Roy.

During a discussion on July 14 regarding payment of the money, Vlahovich said, "The guy's already killed." In the same conversation Harrelson said, "If the son of a bitch is just shot down in the street or something like that, it is going to be pretty obvious," and Vlahovich replied, "You leave that to us."

On July 28 Vlahovich said: "My motto is satisfy the customer." "It's not a favor I am doing. I am getting paid for everything." "You will be satisfied. Don't worry about it. The way this disappearance act—you know what I mean." When Harrelson sought assurance he was the man for the job, Vlahovich answered, "You have my word for it."

On July 30 Harrelson exhibited to Vlahovich what purported to be a certified cashier's check for $17,500 and told him that "If this thing goes off right, and God help you if it don't," he would earn his money. Vlahovich replied: "Don't worry about God helping me. I'll help myself." Vlahovich told Harrelson he never "talked on the guys that he worked for, that he would go to the gas chamber first." He also said: "But

these things really cost you. Every Tom, Dick and Harry can't do it."

Vlahovich argues, first, that he was entrapped into making the statements attributed to him by Harrelson. This contention is unsound, for it was he who suggested that Roy be "rubbed out." It cannot, therefore, be said that he was entrapped. (*People* v. *Benford,* 53 Cal.2d 1, 10 [7, 8] [345 P.2d 928]; cf. *People* v. *Atchley,* 53 Cal.2d 160, 171 [346 P.2d 764].)

There is likewise no merit in Vlahovich's contention that Harrelson's testimony was improperly received in rebuttal. He did not object in the trial court to its reception on this ground; therefore he may not do so on appeal. (*People* v. *Wein, supra,* 50 Cal.2d 383, 407 [37]; *People* v. *Carter,* 48 Cal.2d 737, 754 [20] [312 P.2d 665]; cf. *People* v. *Fitzgerald,* 56 Cal.2d 855, 861 [4] [17 Cal.Rptr. 129, 366 P.2d 481]; *People* v. *Chessman, supra,* 52 Cal.2d 467, 493 [15].)

Finally, Vlahovich contends that the tape recordings were inaudible and unintelligible. The jury had heard the testimony of Vlahovich and Harrelson and were in a position to identify their voices. The recordings were received for the proper purpose of corroborating Harrelson's testimony. (*People* v. *Vetri,* 178 Cal.App.2d 385, 395 [9] [2 Cal.Rptr. 795].) Therefore, it was not a proper ground to exclude them for the reason that they were partially inaudible. (*People* v. *Jackson,* 125 Cal.App.2d 776, 779 [4a], [5] [271 P.2d 196].)

Sixteenth. *Was there any prejudicial error in the redirect examination of Michael?*

*No.* It was developed on cross-examination that Michael had once been committed to the Northern State Hospital, Sedro Woolley, Washington, for 90 days' observation, and that his sister Della and Rosoto had assisted him financially on a number of occasions, the latter providing bail when he was extradited to California for the Safeway robbery.

On redirect, Michael was asked whether prior to March 1957 he had committed any offenses with Rosoto. He testified, over objection, that in 1950, when he was 14, he went to a restaurant where Rosoto was working; that Rosoto gave him $300 or $400; and that he took the money home and they divided it.

Upon being asked whether he had met a Seattle police officer named Pallimini, Michael testified, over objection, that Rosoto introduced him to Pallimini in 1950 and "He used to come pick me up at school, and I used to help him on burglaries." Upon motion of Rosoto, the answer was stricken, and the

objection sustained. Michael then testified that it was ''right after the occasion'' in 1951 that he was sent to the hospital. He testified: ''Well, the Court just sent me there. They wanted to know why I was hanging around with men, when I was only a youngster, with grown men. That is all. That is what they told me.''

Rosoto contends that Michael should not have been questioned about the restaurant and Pallimini incidents. With respect to the former, the contention would seem meritorious; the deputy was attempting to relieve Michael of a charge of ingratitude by insinuating that his brother led him into a life of crime. However, the questions about Pallimini are not subject to this criticism. Michael's commitment was brought out in an effort to show that he was mentally incompetent in 1951, hence mentally incompetent at the time of trial. In final argument counsel stated: ''Michael Rosoto is sick. He has a diseased mind. . . . They had him committed to a mental institution for observation.'' Since Michael testified he was sent to the hospital because of his association with Pallimini, it must be presumed that it was to establish this fact that he was questioned about it. ▮▮▮ The veracity of his explanation was later confirmed by Rosoto, who admitted on cross-examination that he had suffered a prior conviction of grand theft in 1951; that he, Michael and Pallimini were involved; and that it was because of Michael's involvement that Michael was sent to the hospital.

In view of the admissions, there was no prejudicial error in the reception of the testimony, and under article VI, section 4½, of the California Constitution, the error, if any, must be disregarded.

▮▮▮ Seventeenth. *Was it prejudicial error to allow in evidence an unsigned letter of Dr. Jones?*

*No.* Over objection, the People introduced in evidence an unsigned carbon copy of a letter from Dr. Charles Jones, Superintendent of the Northern State Hospital, Sedro Woolley, Washington, to the Supervisor of the Department of Public Institutions, Olympia, Washington, dated April 26, 1951. In the letter Dr. Jones stated that Michael Rosoto was neither mentally ill nor mentally deficient, although he was an habitual delinquent ''whose delinquency is such as to constitute him a menace to the health and safety of others.'' The letter was offered to substantiate Michael's testimony that he was not mentally ill in 1951 and was not committed to the hospital for mental illness.

The letter should not have been received in evidence, since it was hearsay. Nevertheless, the letter did not prejudice Rosoto. It was established by his own testimony that Michael was sent to the hospital for observation, not because of mental illness but because of his criminal association with Officer Pallimini, Rosoto testifying that "the prosecuting attorney, to get Mike out of the picture, sent him to that crazy house." Therefore, the error was not prejudicial and under article VI, section 4½, of the California Constitution must be disregarded.

Eighteenth. *Was there misconduct in the cross-examination of Mr. Monson, a witness for Franklin?*

*No.* Monson testified, in corroboration of Franklin's alibi, that he saw him at the Hitching Post the night of February 6, 1959, dancing with a fat girl. Upon cross-examination, Monson was asked whether he told the deputy district attorney in a conversation at the Disneyland Hotel that he was unsure of the date. When the witness replied that he had said he was not sure the man he saw was Franklin, the question was repeated, the same answer was given at length, the question was asked a third time, and an objection was sustained.

Franklin contends that the deputy was guilty of misconduct in twice repeating the question. However, the deputy was entitled to inquire as to Monson's previous inconsistent statements notwithstanding the fact that the statements were allegedly made to him and not to some other person. Monson's second answer was so complex that it was necessary for the court to explain it to the deputy. The questioning was persistent, but it cannot be deemed misconduct. There was evidence of a statement by Monson that he did not know whether he was in the Hitching Post on February 6. Detective Adams so testified in rebuttal.

Nineteenth. *Was there prejudicial misconduct in the cross-examination of Mr. Makos?*

*No.* When Makos, a witness for Franklin, was asked about Michael's reputation for truth, honesty and integrity, he said, "He is a chronic liar." He was recalled by Rosoto and testified that during the time of the trial he had a conversation at the Hitching Post with Connors, Monson and Michael, in which the latter informed him as follows: He had lied on the witness stand; he had a deal with the Seattle police; he would repudiate his testimony if called again as a witness; and he had himself to worry about.

On cross-examination Makos was asked, "Have you heard, Mr. Makos, that Michael Rosoto provided the police certain information about you?" Rosoto objected upon the ground of hearsay, immateriality and irrelevancy, the objection was overruled, and Makos answered, "Well, no."

Franklin assigns error to the overruling of Rosoto's objection. Although the deputy was entitled to elicit from Makos facts tending to establish his hostility to Michael, the question posed was of doubtful propriety. However, the deputy was not asked to justify his question by an offer of proof, and the matter was pursued no further.

Furthermore, the incident cannot be deemed so harmful to Franklin as to have deprived him of a fair trial. Makos admitted that in the conversation at the Hitching Post Michael told him to go down and tell the truth no matter whom it hurt. Michael denied making the other statements attributed to him by Makos. Connors testified Michael said he told the truth. Monson testified Makos called Michael a rat and stated Michael had said he did not want his brother to get the death penalty and "if they did get the gas chamber, he would come back down." Sufficient reason to establish the hostility of Makos having been elicited from Monson, it cannot be said that the impeaching question wrongfully influenced the jury to deny him credence.

Twentieth. *Did Rosoto suffer prejudicial error by the conduct of the district attorney in interviewing certain of Franklin's witnesses?*

*No.* Monday, August 15, 1960, trial was recessed until Monday, August 22, to enable Franklin's witnesses to fly in from Seattle. On the latter date Mr. Dreizen informed the court that when they arrived in his office at 9 o'clock that morning, the witnesses told him they were met at the airport by members of the district attorney's staff and taken to a hotel and interrogated, their statements being recorded on tape. Dreizen then demanded to see the tape recordings and any transcripts or notes in the People's possession. The court ordered delivery within the hour and granted Dreizen a day's delay to confer with the Washington witnesses.

It is contended by Rosoto, but not by Franklin, that the deputy was guilty of misconduct in interviewing the latter's witnesses before notifying counsel of their arrival. If harm was suffered, only Franklin suffered it. Under the circumstances, there is no basis for Rosoto to complain.

If Franklin was harmed, the harm must be deemed dis-

solved by the deputy's compliance with the discovery order. Furthermore, Franklin has not in his brief assigned misconduct to the action.

Twenty-First. *Was there prejudicial misconduct in the discovery proceedings?*

*No.* July 11 Rosoto and Vlahovich filed an affidavit in support of an oral discovery motion that they had made May 25. They sought to copy, read and examine 18 separate items, including: "Recordings or notes, of conversations of the Defendants Joseph Rosoto and John Frank Vlahovich with the police officers and investigators since their arrest," and "All records, notes and statements made by either of the Defendants that are in the possession of the people." With one immaterial exception, the motion was granted July 13. The deputy district attorney agreed to make statements of the People's witnesses available to the defense 48 hours before each witness was called to the stand.

Meanwhile, prior to July 13, Harrelson had begun recording his conversations with Vlahovich in the county jail. The first recording was made July 8; the others were made July 14, 25, 28 and 30.

The tape recordings of the conversations between Harrelson and Vlahovich were not made available to the defense until after Vlahovich had been cross-examined. On cross-examination Vlahovich was asked whether he offered to kill a man named Roy for $35,000, and whether he told Harrelson that he never talked on the guys he worked for, that he was the man for the job, that there had been this one and several others, and that he had not missed yet. Trial was in recess from August 15 to August 22. On the latter date cross-examination resumed, and further questions were asked of Vlahovich about his conversations with Harrelson on July 14, 28 and 30. Harrelson was called as a witness August 30.

The foregoing facts were mentioned in final argument. Mr. Rice said: "The tape recordings were available to me, the transcripts were available to me, the police reports were available to me before, ladies and gentlemen, before I presented my case in the form of Mr. Rosoto and Mr. Vlahovich. So there were no surprises."

The deputy district attorney said in reply: "Mr. Rice mentioned to you that he got all the reports and tape recordings and everything prior to the time that he presented his case. Now, that is a little bit of testimony from Mr. Rice. And since

the matter has been brought up, let me add a little testimony to it. That is substantially correct. And any reports or statements of a witness who testified for the People were turned over to the defense prior to the time that the witness testified. But, lest there be a little confusion later on, I want to make it clear that, for example, the tape recordings in regard to the witness Charles Harrelson or any statements of Charles Harrelson were not available to the defense until after the examination of John Vlahovich. By that I mean after the cross examination of John Vlahovich. They were available before the witness Harrelson testified but not until after John Vlahovich was cross examined on those subject matters. And I think the evidence is pretty clear that John Vlahovich and the defense did not have knowledge of those.''

Rosoto and Vlahovich contend that the deputy was guilty of misconduct in withholding the tapes. Whether under the order of July 13 he was remiss or justified in withholding the tapes of July 14, 28 and 30 is not the question, for Rosoto suffered no harm and, as will be seen, Vlahovich may not advance the failure to do so as a ground for disturbance of the judgment.

Upon the resumption of cross-examination on August 22, the deputy sought to elicit from Vlahovich an admission that he made to Harrelson on July 14, 28 and 30 statements quoted to him word by word. From the fact that the statements were put verbatim to Vlahovich it was manifest the deputy was reading from a transcript of the statements. It was likewise obvious that since the conversations occurred in the county jail, a transcript could have been obtained only if the statements had been recorded. Counsel must therefore be deemed to have known Vlahovich was undergoing cross-examination upon the basis of tape-recorded statements in the People's possession which, whether within or without the order of July 13, had not been delivered.

If, at the time, counsel had understood the order as requiring the People to deliver these statements, he should have called the matter to the court's attention. Such action would have halted cross-examination, produced a ruling whether the statements were discoverable statements, and afforded counsel a continuance and time to inspect the transcript he had not seen and to listen to the recordings he had not heard. Yet counsel stayed his hand. The inference is therefore inescapable that he did not place upon the order the interpretation now advanced. In any event, if the order must necessarily be

construed as requiring disclosure of the statements, counsel's failure to intervene when intervention would have prevented any harm precludes Vlahovich from asserting misconduct on the appeal. (*People* v. *Meichtry,* 37 Cal.2d 385, 390 [13] [231 P.2d 847] ; *People* v. *West,* 215 Cal. 87, 96 [8 P.2d 463] ; *People* v. *Sieber,* 201 Cal. 341, 356 [13] [257 P. 64].)

Twenty-Second. *Was there misconduct in the prosecution's questioning of Vlahovich, Bushman and Oxandaboure?*

*No.* Vlahovich contends the deputy district attorney committed misconduct during his cross-examination and in the questioning of two witnesses in rebuttal.

Upon the cross-examination of Vlahovich, the following occurred: ''Q. I want to direct your attention to January of this year, January, 1960, and ask you in regard to Mr. Ansich if Mr. Ansich asked you what had happened to the charge against Joseph Rosoto in California, and that you told him on that occasion that one witness was murdered and another one died of fright? A. I didn't say anything like that. I don't recall anything like that. . . .

''Q. Mr. Vlahovich, I want to direct your attention to July 18th, 1960, in this courtroom and ask if on that occasion, in the afternoon, before court started, you said to Mr. Oxandaboure, who sits on my left here, 'I got lots of time, Frank. I am not kidding. I mean it.' A. I stated that? Q. Did you say that on that occasion? A. That is a lie. MR. S. RICE: I will object to this at this time, Your Honor, as being totally immaterial and irrelevant and I believe highly prejudicial, and I don't believe it has anything to do with this particular action. MR. HICKS: I think that certainly is a matter for the jury to decide, Your Honor, as to whether those remarks were made, and their significance if they were made. THE COURT: I will allow the answer to stand. . . .

''Q. Mr. Vlahovich, you have said up in the jail, haven't you . . . to fellow inmates up there, that you knew where Mr. Oxandaboure lived and how many kids he had, and you had plenty of time to take care—— A. That is a—that is a lie. Q. And you made the same kind of statement about me, haven't you, Mr.—— A. Certainly did not. I am not concerned with either one of you, where you live.''

During the rebuttal testimony of Oxandaboure, the following occurred: ''Q. I want to direct your attention, Mr. Oxandaboure, to July 18, 1960, in the courtroom here, and ask you if on that occasion the defendant Vlahovich said to you

. . . 'I got lots of time, Frank. I am not kidding. I mean it.'?
MR. S. RICE: I will now enter my objection, Your Honor, on
the grounds that it is immaterial, incompetent, irrelevant and
tends to bring the character of the defendant Vlahovich in
issue, and the character has not been made an issue in this
particular action. MR. HICKS: Your Honor, this was a remark
addressed to a witness in the case. THE COURT: The Court is
sustaining the objection and the answer will go out.''

Although the court sustained an objection to Oxandaboure's
testimony, the objection might well have been overruled.
Oxandaboure was the chief investigator in the case and a
prospective witness. The incident occurred July 18. Oxanda-
boure testified for the first time August 2. The statement that
he would certainly have related had he not been foreclosed
by the court was a veiled threat, an effort to intimidate him.
The deputy was warranted in believing an objection would
not be sustained. (*People* v. *Chin Hane,* 108 Cal. 597, 603
[41 P. 697]; see also *Sandlin* v. *State of Alabama,* 25 Ala.
App. 311 [146 So. 82, 84 [7]].) No doubt the court sustained
the objection in an excess of caution, and the questioning
cannot be regarded as misconduct.

No objection was made to the questions regarding Ansich,
and even assuming the jury disregarded Vlahovich's denial
and believed he made the statement he denied making, the
implication to be drawn from it was no more harmful than
the fact that Vlahovich was in court when Allen testified and
the latter was visibly shaking.

Any attempt to substantiate Vlahovich's statements to other
inmates in the county jail would no doubt have resulted, as
in the case of the witness Bushman hereinafter referred to,
in exclusion of their testimony.

During presentation of the People's case in rebuttal, the
following occurred: ''MR. HICKS: Your Honor, may I call the
defendant Vlahovich for one question, probably two or three
to lay a foundation? It will be very brief. MR. S. RICE: This
is improper rebuttal, Your Honor. I will object to this. MR.
HICKS: It is in a matter, Your Honor, that has come up since
the defendant Vlahovich last testified, and it would have been
impossible—— THE COURT: I will give you that privilege.
Go ahead.''

Vlahovich then resumed the stand and testified as follows:
''RECROSS-EXAMINATION BY MR. HICKS: Q. Mr. Vlahovich, I
want to direct your attention to yesterday afternoon in this
courtroom, at the time the court, or shortly before court re-

convened at two o'clock or a few minutes after two o'clock. Were you in the courtroom at that time? . . . A. Yes, sir. Q. And at that time, Mr. Vlahovich, you observed Charles Harrelson enter the courtroom, did you not? A. Yes, I did. Q. Mr. Vlahovich, on that occasion and before court convened, I will ask you, if, yesterday, in regard to Mr. Harrelson, you said to the defendant Rosoto, 'He might as well commit suicide. He won't live thirty days.' Mr. S. Rice: I will object. The Witness: That is one of the worst lies I have ever heard in my life. No, sir. . . . If I said anything like that I would just drop dead.''

Harold Bushman, Jr., a witness called on behalf of the People, then assumed the stand and testified as follows: ''Direct Examination by Mr. Hicks: Q. Mr. Bushman, you also appear to be a Deputy Sheriff. A. Yes, sir. Q. And were you—you were employed in that capacity yesterday? A. Yes, sir. Q. And were you in court yesterday afternoon shortly before court convened at two o'clock or a few minutes thereafter? A. I was. Q. And did you observe Mr. Vlahovich looking in the direction of—of Mr. Harrelson? A. Yes, sir. Q. Then was there an occasion when Mr. Vlahovich addressed a remark to the defendant Rosoto? A. He addressed a remark, yes, sir. Q. And where was Mr. Vlahovich standing at that time? A. Approximately a foot to eighteen inches this side of where he is sitting at the present time, near the railing. Q. Where was Mr. Rosoto at that time? A. Mr. Rosoto was proceeding in this direction, in the general vicinity of where you are, possibly a little closer to the chair on your right, sir. Q. And where were you at that time, Mr. Bushman? A. I was standing in the gap between the railing behind you, sir. . . . Q. On that occasion did Mr. Vlahovich say, 'He might as well commit suicide. He won't live thirty days'? A. Yes, sir.

''Mr. S. Rice: I am going to move at this time, Your Honor, that all of this testimony be stricken as immaterial, irrelevant, highly prejudicial. The Court: May I ask the purpose of this? Mr. Hicks: Yes, Your Honor. I think it shows the state of the defendant's mind, which is in inquiry here, and more particularly, the state of his mind toward witnesses. Mr. S. Rice: Your Honor. The Court: The court is granting the motion and ordering it stricken. Mr. S. Rice: May also the testimony, then, of the defendant Vlahovich also be stricken on the same grounds, Your Honor? The Court: Well, the witness denied the questions, so I am going to allow that to stand. Mr. S. Rice: All right, Your Honor. The Court: Any other ques-

tions? MR. HICKS: Well, Your Honor, might I move, then, that the defendant—that my questions of him and his answers be stricken? I would hate to be in the position where counsel could argue that it was denied and I was not in a position to offer the evidence in regard to it. THE COURT: All right. It will go out on that basis, then. The jury will be instructed to disregard the testimony of both witnesses.''

The foregoing is assigned as misconduct upon the ground that the deputy district attorney had no right to call Vlahovich during rebuttal and upon the additional ground that the questioning was improper.

There is no basis for an assumption that the deputy was seeking to make Vlahovich his own rebuttal witness. The court, as well as the court reporter, understood the deputy to be requesting the privilege of further cross-examination, and it was within the court's discretion to permit the recall of Vlahovich even though he had already rested his case. (Code Civ. Proc., § 2050; *People* v. *Searing,* 20 Cal.App.2d 140, 142 [4] [66 P.2d 696]; *People* v. *La Vers,* 130 Cal.App. 708, 713 [4] [20 P.2d 967]; *cf. People* v. *Keith,* 50 Cal. 137, 140.) The matter involved was clearly related to the previous cross-examination about Harrelson.

In this instance, as in the instance involving Oxandaboure, the court excluded testimony it might well have admitted. Vlahovich's statement to Rosoto, as related by Bushman, was a threat against Harrelson. Vlahovich was on trial for murdering a witness in a criminal case; Harrelson belonged to a class to which Simpson also belonged—witnesses for the prosecution. The statement might well have been regarded as evincing a consciousness of guilt or at the very least a consciousness that Harrelson's testimony was true. There was a tenable legal basis for the questioning, and it did not constitute misconduct. In any event, the court admonished the jury to disregard the testimony of Vlahovich and Bushman, and it must be presumed the jury heeded the admonition.

Twenty-Third. *Did the trial court properly refuse two instructions reading as follows?*

*"If you find that if [sic] either party concealed or destroyed evidence in order to prevent its being brought before the court in this trial, you may presume that the evidence, if presented, would have been adverse to them, and you may consider their conduct [in] determining the merits of their case."*

*"If you should find that it was within the power of the*

*prosecution to produce stronger and more satisfactory evidence than that which was offered on a material point, you should view with distrust any weaker and less satisfactory evidence actually offered by them on that point.''*

*Yes.* The first instruction relates to the wilful suppression of evidence and the second to the People's asserted failure to produce stronger evidence than was in fact produced. Since there was no proof that evidence had been wilfully suppressed or that there was stronger evidence which was not produced, both instructions were properly refused. (*People* v. *Williams,* 155 Cal.App.2d 328, 331 [4] [318 P.2d 106]; *People* v. *Chapin,* 145 Cal.App.2d 740, 750 [303 P.2d 365].)

Twenty-Fourth. *Did the trial court commit prejudicial error in giving the following instruction?* ''*When one who was not at the place where a crime was committed at the time of its commission is later charged with having been present and having committed or taken part in committing such crime at the scene of such crime, his absence from the scene of the crime, if proved, is a defense that we call an alibi.*

''*The defendants Joseph Rosoto, John Frank Vlahovich and Donald Glen Franklin in this case have introduced evidence tending to prove that they were not present at the time and place of the commission of some or all of the alleged offenses for which they are here on trial. If, under the evidence you find the defendant or defendants were not principals but had to be present at the scene of the offense in order to be guilty thereof, and you have a reasonable doubt whether or not the defendant or defendants were present at the time the crimes were committed, they are entitled to an acquittal.''*

*No.* Franklin requested the following instruction: ''When one who was not at the place where a crime was committed at the time of its commission is later charged with having been present and having committed or taken part in committing such crime, his absence from the scene of the crime, if proved, is a complete defense that we call an alibi.

''The defendant Donald Glen*n* Franklin in this case has introduced evidence tending to prove that he was not present at the time and place of the commission of the alleged offense, for which he is here on trial. If, after a consideration of all the evidence, you have a reasonable doubt whether or not the defendant was present at the time the crime was committed, he is entitled to an acquittal.''

The court gave, instead, the instruction hereinabove quoted in question Twenty-Fourth.

354

Franklin contends his instruction was proper and the one given was fatally defective. He assigns error to the phrase ''were not principals,'' which was added to the People's proposed instruction by the court for the purpose of telling the jury that one who is not present at the scene of a crime but aids and abets in its commission is not absolved from complicity simply because of his absence.

It is argued that since all persons concerned in the commission of a crime are principals, to inform the jury that an alibi is a defense only for persons who are not principals but who must be present at the scene of a crime to be guilty of it is tantamount to an instruction that an alibi is no defense at all.

For the purposes of this case we may assume that Franklin's proposed instruction was a proper one under the circumstances and that the instruction given was erroneous. However, the error was not prejudicial, as the inappropriate language in the second paragraph must be read with the language in the first paragraph. The latter stated unequivocally that one who was not present at the scene of a crime but who is later charged with having been present and having committed it may prove his alibi as a defense.

It was the theory of the People that Franklin was an active participant in the murder in Anaheim and not that he aided and abetted from a distance. It was the theory of the defense that on the morning of February 7, 1959, Franklin was in Seattle, 1,200 miles away. It is inconceivable that the challenged instruction could have misled the jury into believing that his whereabouts at that time were irrelevant to his guilt. The jury was out four days. During their lengthy deliberations, the jurors returned to have reread to them the instructions on conspiracy, on accomplices, on confessions and admissions, and certain testimony of Michael, Barbara Hale, Franklin and Ralph Wesley Johnson, and to have a tape recording replayed. Had the jurors been confused by the alibi instruction, they would have requested that it also be reread and explained.

If the jury had believed the testimony of Franklin and his alibi witnesses, it would necessarily have rejected the testimony of Michael and Barbara Hale, and, having done so, would have acquitted him, for without Franklin's admissions to Michael and Barbara, the People had no case. To hold that the instruction deprived Franklin of his defense would require this court to assume, against reason, that the jury

may have sent him to his death believing that he told the truth.

**Twenty-Fifth.** *Did the court properly instruct the jury on the doctrine of lying-in-wait?*

*Yes.* The court gave four instructions on lying-in-wait, which are not challenged as inaccurate statements of the law. Franklin contends, however, that there was no evidence of lying-in-wait, and that the instructions should not have been given.

It was proper to give the instructions. Mrs. Simpson testified that as her husband started up the sidewalk toward the front porch of their house, a tall, thin man ran up from the north side of the house and opened fire with a big gun. It was after 3 a. m. The jury could reasonably have inferred the killer was in hiding and was waiting for the Simpsons, since no one saw him before the murder, and his approach to Simpson coincided with the latter's approach to the front porch.

Lying-in-wait is sufficiently shown by proof of concealment and watchful waiting. (*People* v. *Byrd,* 42 Cal.2d 200, 209 [266 P.2d 505]; *People* v. *Sutic,* 41 Cal.2d 483, 492 [5] [261 P.2d 241]; *People* v. *Tuthill,* 31 Cal.2d 92, 100 et seq. [187 P.2d 16].)

The instructions were warranted by the testimony of Mrs. Simpson, together with Franklin's admission to Michael that they "had to wait around two hours for the guy to come home."

**Twenty-Sixth.** *Did the trial court commit prejudicial error in instructing the jury on the penalty?*

*No.* The People offered a standard instruction on penalty (CALJIC 9), reading: "In arriving at a verdict in this case, you shall not discuss or consider the subject of penalty or punishment, as that is a matter which lies with the court and other governmental agencies, and must not in any way affect your decision as to the innocence or guilt of a defendant." The court gave this instruction after striking therefrom the language following the word "punishment."

Franklin contends the instruction, as modified, directed the jury to find him guilty of first degree murder. The contention is one that he may not assert. When the court announced its intention to modify the instruction, counsel for Franklin said, "I think that is fair," and counsel for Rosoto and Vlahovich said, "That would be much better." Having

consented to modification of the instruction, Franklin may not complain of it.

Twenty-Seventh. *Did the trial court commit prejudicial error in allowing the jury to take the indictment to the jury room?*

*No.* The jury returned during its deliberations to ask questions of the court, and at that time the court said, "And, also, the parties have agreed that if you feel you need the indictment, we will give you a copy of the indictment." Upon being asked whether the jury believed the indictment would be of assistance, the foreman replied, "Yes, Your Honor, we feel we need it."

After taking the indictment into the jury room, the jury returned and inquired the meaning of certain language in counts VII and VIII. After a discussion with counsel the court instructed the jury: "Now, that paragraph and the other paragraphs that I have stated, are there purely for the basis of pleading. By putting this particular paragraph in the count, it allows the District Attorney's office to bring more than one count in one indictment alleging that they are connected. But it has nothing to do with the charge itself. In other words, the charge of perjury is one charge in two different counts. The charge of murder is separate, itself. Those all have to be proved. But in the way of pleadings, so that the District Attorney's office can bring them all together, he has to allege that they are connected. But it has no bearing as to the actual proof."

Defendants contend that the jury should not have been permitted to have the indictment during its deliberations. However, the court stated that counsel had agreed to the procedure, and there was no expression of disagreement. Even in the absence of consent, the matter was within the court's discretion. (Cf. *People* v. *Walther,* 27 Cal.App.2d 583, 593 [11] [81 P.2d 452]; 120 A.L.R. 463 et seq.)

The court carefully instructed the jury that the connective language in the various counts consisted of surplusage included for pleading purposes, that it was not evidence, and that it was to be disregarded. When asked whether the instruction explained the jury's question, the foreman replied that it did. The instruction was ample to protect defendants' rights, and it must be presumed that the jury gave heed to it.

Twenty-Eighth. *Did the deputy district attorney commit prejudicial misconduct in his closing argument?*

*No.* During a lengthy argument, allegedly composed of incident upon incident of reprehensible insinuations and distortions, competent counsel did not move to strike one statement, requested no admonition, made no assignment of misconduct, and sought no aid of the court to shield the jury from comments upon which they have now lavished all the resources of their invective.

Misconduct in argument may not be assigned on the appeal if it is not assigned at the trial, unless the misconduct contributed to the verdict or was so unredeemable that nothing whatever would have cured it. (*People* v. *Berryman,* 6 Cal.2d 331, 337 [57 P.2d 136].) The question is, therefore, whether the statements of the deputy district attorney were such as to command a reversal of the judgment in the absence of any attempt to forestall or correct them.

There are 20 assignments of error, as follows:

1. After noting "looks of unhappiness" on the faces of the jurors, the deputy said in apologizing for the intended length of his argument: "The case, from our standpoint, is a year and a half old. The case, from your standpoint, is four months old, and if I feel in good conscience that I am going to have to talk to you even 10 extra minutes and force everyone of you to come back tonight to hear me for 10 extra minutes, I am going to do it and apologize to you for it, but I am going to do it."

Franklin assigns the statement as misconduct. It was not misconduct. The case was, in fact, a year and a half old, for it was in March 1959 that Sergeant Cook asked Rosoto to come to the police station for questioning. The jury knew the case was an important one, and the statement is hardly susceptible of an interpretation that the deputy thought it of greater importance to him than to the defense. The jurors were bored and tired, and the deputy was merely recalling them to their duty.

2. Franklin testified that when he returned from the Hitching Post the night of February 6, 1959, he said goodnight to his mother and went to bed. She was not called as a witness. In commenting upon her absence, the deputy said: "His mother did not testify. Now, don't misunderstand me. His mother wouldn't get up here and testify that he did it. I know that. But here is an opportunity to corroborate that was not taken advantage of."

It was proper to comment upon the failure to produce Mrs. Franklin as an alibi witness. (*People* v. *Carter,*

116 Cal.App.2d 533, 539 [6, 7] [253 P.2d 1016]; *People* v. *Gist*, 28 Cal.App.2d 287, 292 [6] [82 P.2d 501].) ▮ The statement was crude, but it was not misconduct. The deputy was informing the jury that Franklin's guilt was not necessarily to be inferred from his mother's absence but that her absence was a circumstance to be considered in weighing his alibi.

▮ 3. The deputy attacked the credibility of Weir, a witness for defendants, in a passage too long to set out in full. It was permissible to argue to the jury that Weir's testimony he did not see Barbara Hale at the wedding reception was insufficient justification for his confident assertion that she was not there, and Weir's statement, "My fiancee would have questioned me because she knows about Barbara Hale," afforded the deputy some justification for arguing that Weir may have testified to Barbara's poor reputation for truth, honesty and integrity because his betrothed disapproved of his former girl friend. The deputy should have refrained from suggesting that Barbara might have acquired that reputation through association with Weir, but there was no objection to this statement. Had there been one, the court would no doubt have admonished the jury to disregard the statement.

▮ 4. Michael testified that when Franklin beat him up in October or November 1959, he said, "Your brother Joe told me to do this, you rat." Franklin's version was that there had been a fight, which he won, and that afterward Michael said: "I will get you. I will bury you." During the Skyway Motel conversation Rosoto said regarding the beating, "Well, you deserved it."

The deputy told the jury that although Rosoto's statement was not evidence against Franklin, it did corroborate Michael's statement that "Don Franklin told him at the time he was doing it for his brother Joe." Then the deputy remarked, "Think in terms of violence."

The argument could not have contributed materially to the verdict against Franklin. It is undisputed that there was a fight in October or November 1959. Under both versions Michael had a reason for enmity against Franklin. Accordingly, whichever version the jury accepted, it could have drawn the inference that Michael lied in testifying that Franklin was present at the Roma Café and visited him in March 1960. The argument, therefore, could not have been responsible for the jury's refusal to draw that inference.

5. In referring to the testimony of Barbara Hale, the

deputy said: "She testified that he didn't say Joseph Rosoto. She said that he said Joe. That is in February. Now, in May or June she ties up this conversation—oh, there's a lot of other questions asked of Barbara Hale: 'Did you hear what else Franklin said?' 'No, I don't remember anything else.' This seems kind of sensible to me. Maybe it won't to you. Three months later she hears Donald Franklin at the Hitching Post telling her how he's got away with things, and this is one of the things he has gotten away with. And that Joseph Rosoto had mentioned February. And, now, the remark at the wedding reception makes sense and she remembers it."

The clause "Joseph Rosoto had mentioned February" is obviously a mistranscription of what the deputy said. He was clearly intending to make the point that since Rosoto's name had been mentioned in the Hitching Post in May or June, he was the Joe whom Franklin had mentioned at the wedding reception in February. The deputy's reconstruction of Barbara's mental process was not unreasonable and not improper.

6. In commenting upon Michael's failure to mention Franklin to Captain Rouse on the night of the Roma Café conversation, the deputy said, first, that Rouse's memory may have been in error as Franklin admitted seeing Michael at the Roma Café in the company of Rosoto and Vlahovich. The deputy then stated: "He [Michael] may very well have left his [Franklin's] name out on purpose. He didn't know Franklin was involved in this business down here at that time. He didn't know that. He may very well have tried to protect Donald Glen Franklin and, so, put it in a slightly different light."

The argument was speculative, but it was not misconduct. The fight between Michael and Franklin did not occur until October or November 1959, and there was no evidence of any enmity between them in May of that year. The argument was not unwarranted by the evidence, and it was for the jury to determine whether it was tenable or untenable. (*People* v. *Eggers*, 30 Cal.2d 676, 693 [185 P.2d 1].)

7. In explaining why Michael did not inform the grand jury on March 12, 1960, of Franklin's recent admissions to him, the deputy said: "Did you expect the District Attorney's Office or the Grand Jury to indict only on the testimony of Michael Rosoto? You would look for some corroboration of what he had to say. So would we. And if he didn't testify to those events on March 12th, it may not have

been by accident. You will bear in mind that Donald Glen Franklin was not indicted until April.''

Making this statement did not constitute misconduct. The implication that Michael's testimony would not, standing alone, have justified the deputy in seeking an indictment against Franklin was a concession highly favorable to him, and it is surprising that he has complained of it. Barbara Hale, who corroborated Michael, did not talk to the police until March 31. Furthermore, the jury knew it was to judge Franklin upon the basis of the evidence presented at the trial and not upon what was or was not said before the grand jury on March 12.

8. In discussing Barbara's testimony, the deputy said: ''You are asked why would Donald Glen Franklin tell Barbara Hale. Donald Glen Franklin may well have made the same mistake that Mr. Dreizen made in referring to Mr. Chilfone as a step-father, I think, a former step-father of Michael Rosoto. It is clear from this evidence that Louis Chilfone is no relative of Michael Rosoto. But, how safe and sort of within the Rosoto family it would seem in May or early June for Donald Glen Franklin to talk to somebody within what looked to him to be the family, the same group. And Michael Rosoto had just come around to the other team again. Michael Rosoto had just run down to Mr. Ursich's office in May and straightened out that insurance business for his brother. And Michael Rosoto was still a good guy and Barbara Hale was one to be trusted.''

The argument was proper. The deputy was entitled to argue his own case and was not obliged to accept as the truth Franklin's denial that he knew Barbara. Barbara's mother was married to Chilfone, the uncle of Michael's first wife, and the alleged conversation with Barbara occurred at the Hitching Post, where Franklin had seen Chilfone and his family.

9. The deputy said: ''I don't doubt that Mike Rosoto's reputation for truthfulness is bad or poor. . . . Now, your job is simply to say, 'Did he tell the truth here? . . .' When you have committed as many crimes as Mike Rosoto told you he did, I doubt if it benefits your reputation for truthfulness very much. And I can only say this to you: That the testimony of a fellow who says 'I have done these things; they are bad' is more worthy of belief than the testimony of the fellow, here today, who says, 'I didn't do anything. I didn't do anything.' And he is shown to be a liar

about it. One is leveling with you and one is not. And if you can show me a place where Mike Rosoto spared himself in describing what he was, what he has been, I will put in with you.''

Franklin contends the deputy should not have expressed his personal belief in Michael's credibility. The deputy did not exceed the bounds of proper comment. (*People* v. *Baker*, 183 Cal.App.2d 615, 624 [12] et seq. [7 Cal.Rptr. 22]; *People* v. *Gonzales*, 151 Cal.App.2d 112, 116 [6] [311 P.2d 53].) The argument itself was a reasonable one, and the fact that it was couched in the first person can hardly be regarded as an attempt to overbear the jury.

10. In arguing against Rosoto, the deputy stated: ''I saw something the other day. We have to read cases once in a while in this business. You know, cases that have been decided in other years. And I read an observation by a Court in Maine to the effect that . . . 'Any guilty man—any guilty man accused of crime who does not confess can only do two things. He has two alternatives. Remain silent or lie.' ''

Although the argument was not directed against Franklin, he contends the deputy was inviting the jury to convict him because of his silence on some unspecified occasion. However, the statement has been taken out of context. Immediately thereafter the deputy said: ''Now, don't draw inferences from silence if it is a situation where silence is appropriate, where a person can remain silent. Don't draw inferences from that. But, boy, you can sure draw them from lying.''

11. The deputy said: ''This is the deadliest type of crime, the professional type of crime, where someone lies in wait with a shotgun, who has carefully planned and carefully concealed, who has carefully organized this situation and unsuspectingly takes the life of another human being. How do we go about working with that? You don't start from the outside and work in; you start from the inside and work out. You bore from the center. And you wait until somebody makes a mistake, until somebody who was concerned with it, who was involved in it, who participated in it, who organized it, who had it done, trusts somebody they shouldn't have trusted. They tell somebody they shouldn't have told. And that's what you have here.''

Franklin contends this was merely a statement of the deputy's opinion. It was, however, not only a concise outline of the People's case but a meticulous description of the way in which the People had prepared it, that is, by using Michael

as an informer. It is a matter of common knowledge that gangland murders have been committed with shotguns and in ambush; and if the jury accepted as true the testimony of Barbara Hale, they could scarcely have regarded Franklin as an amateur.

12. In justifying the payment of an ''informer's fee'' to Michael, the deputy stated: ''And, as a matter of fact, if some of you people know somebody who is cheating on their income tax, the Federal Government will pay you 10 per cent of what they recover.'' What the deputy said is true in substance. (26 U.S.C.A. § 7623; U.S. Treas. Reg. § 601.104(5).)

13. The deputy stated: ''Casual relationship between Don Franklin and Rosoto and Vlahovich? Hardly knew each other is the way Mr. Rice described it. Both of them had Don Franklin's telephone number on their person. Hardly knew Johnson? Both of them had Johnson's telephone number on their person. They're exhibits in evidence.''

Counsel objected, and the deputy corrected himself, explaining that the telephone numbers were found in a wallet in the car Rosoto was driving at the time of his arrest and on a dresser in Vlahovich's residence. The deputy's misstatement was trivial; the wallet contained Rosoto's driver's licenses.

Nor is the argument susceptible to Franklin's criticism that the deputy was attempting to use evidence admitted only against his codefendants as evidence against him. The deputy began by a clear implication that he was replying to the arguments of counsel for Rosoto and Vlahovich. Immediately after the challenged comments he said: ''What was the matter with the truth? And, if he didn't know Franklin, how did he get Franklin's phone number when he went up there? How did he know where Franklin lived? How did he know which Don Franklin in Seattle? . . . And he doesn't know him? Just, you know, met him?''

The jury must clearly have understood these remarks to constitute a single argument, an argument not against Franklin but against Rosoto. If counsel had any doubt at the time as to the direction of the argument, he would surely have registered a protest and have reminded the jury of the limited purpose for which the evidence relating to the telephone numbers had been received.

14. The deputy said: ''But, it is all brought up. . . . It is not the voice of Mike Rosoto when they are talking about the beating that says, 'You deserved it.' It is the voice

of Joseph Rosoto. It is not the voice of Mike Rosoto when Mike tells him that they came out and looked at the wedding book and Franklin's name was on it. It is not Mike's voice that says, 'That's the one they would be looking for.' That is Joseph Rosoto's voice.''

The challenged remarks have been isolated from their context. In context, they are clearly a continuation of the argument against Rosoto. Had counsel thought at the time that the deputy was seeking to use Rosoto's statements in the Skyway Motel conversation as evidence of Franklin's guilt, he would certainly have requested the court to repeat the admonition, so often given throughout the trial, that evidence admitted against one defendant was not to be considered against the others.

15. In explaining why Michael was placed in a mental institution in 1951, the deputy referred to Michael's testimony that Rosoto had introduced him to Pallimini, that when he was just a boy he participated in burglaries with Pallimini and that that was the reason for his being sent to the hospital.

It is true that Michael's testimony regarding Pallimini had been stricken, but the same explanation had been elicited from Rosoto on cross-examination. The deputy was guilty of no more than an understandable lapse of memory.

16. In the course of the same argument, the deputy said that when Michael was 13 or 14, ''he went in and Joseph Rosoto handed him all the money in the place. That was the first thing he was involved in.''

Rosoto contends that ''the money may have belonged to Appellant [Rosoto].'' However, it is clear from the questions put to Michael that a criminal offense was in issue. Although the questions should not have been asked, Rosoto's admissions of contemporaneous involvement with Michael and Pallimini were sufficient to dissipate any harm that might be urged to have accrued from the questioning.

17. The deputy told the jury that if Michael had confessed his guilt of the South Seas robbery to Ursich in 1957, Ursich would surely have mentioned his confession in a letter to Gottes, an attorney representing Rosoto in Orange County.

The argument is one that might well have been omitted, but counsel did not intervene to have the court inform the jury that the occasion when Michael allegedly exonerated Rosoto may have been privileged. Furthermore, it was not

this statement of the deputy that caused the jury to disbelieve Rosoto's testimony on the point at issue, for Rosoto admitted he did not mention the alleged confession to Gottes. The deputy said: "Joseph Rosoto said he never talked to him about it. . . . That is inconceivable, isn't it?"

18. The deputy told the jury that Mickey Sevester did not spare herself on the witness stand, and said: "And what in the world has she to gain by telling you anything but the truth? . . . If there is one thing you folks ought to be experts upon, it is the statute of limitations. [There had been extensive *voir dire* on the statute.] And it has run on her, on anything she had done.

Rosoto contends there was no evidence the statute had run, because "it may very well be true that she was absent from the State of California for a sufficient period of time that would make her responsible for her illegal conduct." However, the statute had run. (Pen. Code, §§ 800, 802.) There was no evidence of Mickey's absence between 1956 and 1960 sufficient to toll it; and there is a presumption, which was evidence, that having resided in California at the material times in 1956 and 1957 and at the time of trial, she did so in the interim. (Code Civ. Proc., § 1963, subd. 32.)

19. Counsel for Rosoto had argued that in 1957 "Captain Hamilton and the Los Angeles Police intelligence unit knew about each and every one of these activities. What did they do about it? Nothing. They never arrested Joseph Rosoto or brought him to trial for these particular offenses because they, themselves, ladies and gentlemen, could not believe it. They could not substantiate the fact that Joseph Rosoto participated in these crimes."

In reply, the deputy mentioned that Los Angeles police officers had been present at the Skyway Motel on February 6, 1960, and then he said: "I can tell you why he wasn't prosecuted, within our record, I believe. . . . Everyone of you . . . will be instructed about the accomplice rule . . . to the effect that a man cannot be convicted on the testimony of an accomplice alone. And the problem in Los Angeles in 1957—not that they could have got him back, either, with his automobile accidents and the like—but the problem in 1957 was that even if you would have been able to get Jenkyn to testify, then, even if you would have been able to get Mickey Jenkyn to testify, then, or Pete Ricardi [*sic*] or Pheaster, you would have run smack into the accomplice rule. And it wasn't until we got down into the bush leagues in Orange County, where

Joseph Rosoto went in a place, for once—when I say bush leagues I am suggesting to you that that is how he thought—'I'm out of Los Angeles. I'm down here in the country. I can go inside and it is not dangerous'—and it wasn't until they got here that you got around the accomplice rule."

The challenged statements were based firmly on the record. The evidence established that Rosoto did not enter any of the eleven other establishments which the People sought to show he had been instrumental in victimizing. Mickey Sevester testified that the day after the South Seas robbery he remarked, "It is the first time I have gone in on one of the jobs in about ten years, and I really had a ball."

 20. During his argument, counsel for Rosoto had accused the district attorney and the police of suppressing evidence, taking advantage of "weak," "sick," "cowardly" men like Larson, Suboter, Jenkyn and Riccardi and causing "this weak, sick individual" Michael to betray his family. He said: "What more hideous crime can there be than to teach dishonor? What terrible tragedy of morals can there be displayed when governmental officials are proud of themselves for this conduct?" He asked about Sergeant Cook, "Is this an honorable man?" and a moment later called him a liar and a coward.

He also said: "Who gives the right to Captain Rouse in Seattle—who gives the right to the police down here in Orange County to use this man against his own brother? What shameful conduct could possibly be displayed in a courtroom in 1960 and not cause within each of us some form of revulsion, make your skin crawl because, believe me, ladies and gentlemen, if this can be done and if this is tolerated, I am telling each and every one of you now 'Pack your suitcases, kiss your husbands good-bye, wrap your arms around your children because it can be you tomorrow.'"

In reply to these accusations and toward the close of his argument, the deputy stated: "Certainly in connection with the incidents surrounding the South Seas, for that testimony to be anything but true, there must be some master-minding fiend the likes of which has never existed on this Earth. Who in the world is capable of organizing that kind of evidence? Who in the world is capable of finding the people? Who in the world—and it can't be one person, can it? It's going to have to be Anaheim. It is going to be the District Attorney. It is going to have to be the Los Angeles Police Department. It is going to have to be the Long Beach Police

Department and not just one person in those departments but several. Why, there would have to be a conspiracy afoot here that ran into dozens of people. And somehow in some magical way we have never missed, is that it? That everybody we approached fell into line? Wouldn't somebody go screaming and saying, 'Good night, what they're trying to do.' No, it is not there. It is not there. Those people came in and told you the truth. . . .

"The Court will instruct you that you are to . . . find in your minds whether the defendants are proved guilty beyond a reasonable doubt, and, in case of a reasonable doubt, to find them not guilty.

"Are there things here that you can reconcile with a reasonable doubt . . . bearing in mind that at all times the burden of proof is on the People. . . .

" . . . . . . . . . . .

"Is it reasonable to you that all of this was organized by somebody to get these people? That's incredible, isn't it?

" . . . . . . . . . . .

"To have produced this mass of evidence somebody had to —unless it is true—somebody would have had to sit back and organize it. And there just isn't any such person.

"Ladies and gentlemen, if that is reasonable to you, if it is reasonable to you that the law enforcement agencies of Orange County . . . have falsely produced evidence in court; that they have induced witnesses to lie, that they have produced this fantastic mass of evidence. If that is reasonable to you, pack your bags and move.

"Would you live in a county if you thought it was just reasonable—you would have to find it so—if you think it is reasonable in your minds that this happened? Would you continue to live here?"

Franklin contends the foregoing argument constituted misconduct. It was made in reply to argument that the case against Rosoto was constructed through the brainwashing of accomplices and other immoral means. The argument contained a direct accusation of cowardice and of mendacity against Sergeant Cook. It was an argument that hardly could have gone unchallenged.

The reply was vigorous, but it did not exceed the limits of proper argument. The deputy did not expatiate upon Cook's rectitude and upon his own. He argued, as he had a right to do, that any conspiracy to frame defendants would necessarily have involved the entire law enforcement facili-

ties of Orange County. Then he referred in detail to acts and conduct of defendants which he asserted were consistent with guilt and inconsistent with innocence and argued, as he had the right to do, that it was incredible that "all of this was organized by somebody to get these people." He concluded with a close paraphrase of the words counsel had employed in accusing the police of shameful conduct.

The deputy was entitled to repudiate allegations that defendants had been framed. He was entitled to refer in an argumentative manner to evidence which militated against counsel's accusations and from which the jury could reasonably find that defendants were not telling the truth. He was warranted in asserting that if the People's case were composed of perjured testimony carefully collated by law enforcement officials, no juror would care to live in Orange County. The final statement was a strong one. However, if the jurors had interpreted it as an effort to threaten, intimidate, or coerce them, they would no doubt have manifested their resentment in verdicts of acquittal.

The judgments are affirmed.

Gibson, C. J., Traynor, J., Schauer, J., Peters, J., and White, J., concurred.

Appellants' petitions for a rehearing were denied August 29, 1962.