Filed 1/31/14  P. v. Moore CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# COPY

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>  v.<br><br>BARBARA JEAN MOORE,<br><br>    Defendant and Appellant. | C070751<br><br>(Super. Ct. No. 10F7081) |

A jury found defendant Barbara Jean Moore guilty of assault with force likely to produce great bodily injury, battery on a peace officer, resisting an officer, and public intoxication, but found not true the allegation that she personally inflicted great bodily injury.  The trial court placed defendant on probation for three years, ordering her to serve 90 days in county jail.

Defendant appeals, claiming her conviction for assault with a deadly weapon must be reversed due to instructional error.  We affirm the judgment.

1

FACTS

The circumstances surrounding defendant's crimes took place on Sunday night, September 20, 2010, at a bar called the Castle Lounge in Redding, California. The bartender, Crystal Robertson, was working a 6:00 p.m. to 2:00 a.m. (closing time) shift by herself that night. The bar had been busy with patrons watching Sunday night football, but business slowed down considerably once the game ended.

At approximately 9:00 p.m., Jacob Helle, a regular at the Castle Lounge, stopped by to say hello. Helle chatted with Robertson and others as he sipped a beer and watched highlights of the football game at the bar.

Robertson's friend, Semone Bassett, another Castle Lounge regular and a bartender herself, arrived between 9:00 p.m. and 10:15 p.m. Semone sat at the bar talking with her friend, Chris, as she waited for her husband, Justin, to get off work. Justin worked as a bartender at another bar, and was also a regular at the Castle Lounge.

Defendant entered the bar with a female friend sometime between 9:00 p.m. and 10:00 p.m. They met up with two male friends, ordered the first round of drinks, and then went to the back of the bar to socialize and play pool.

Approximately 20 minutes after ordering the first round of drinks, defendant and her three friends approached the bar to order a second round of drinks. Defendant bumped into Semone and the two exchanged looks. Robertson noticed defendant's behavior "[wasn't] very nice." Defendant's male friends purchased drinks and returned with defendant and her female friend to the pool area.

As the evening wore on, defendant became "increasingly loud" and was beginning to stumble a bit and slur her words. Robertson recalled seeing defendant stumble as if she had had too much to drink. Defendant and her girlfriend approached the bar to order another drink. Robertson served defendant's friend a drink, but told defendant, "I can't serve you any more drinks because you're kind of -- seems like you had a little too much

2

. . . but you're more than welcome to stay in the bar." Defendant said, "Okay," and she and her friend went to sit in the smoking area adjacent to the bar while their two male friends played pool.

About that time (approximately 11:00 p.m.), Justin arrived at the bar. Justin ordered a beer, went to his house nearby to retrieve his pool cue, and returned to play pool with Tony, another Castle Lounge regular.

Approximately 20 to 30 minutes after refusing to serve defendant any more alcohol, Robertson opened the door to the patio and looked out to see what was going on in the smoking area. She noticed defendant had a drink in her hand. Robertson walked out to the smoking area and said, "I told you that you were cut off," and took the drink away from defendant. Defendant immediately became angry and aggressive toward Robertson, calling her a "bitch" and yelling profanities at her. Defendant grabbed the drink from Robertson and threw its contents at her, letting the glass fall to the ground and break. She then shoved Robertson. Robertson said, "Okay, time for you to go; you have to leave." Defendant responded, "I'm not leaving . . . I want my drink."

Having heard raised voices, Helle, Justin, and Semone had already moved to the door of the smoking area and were watching the confrontation. Justin told Semone to "go sit down and stay out of it." Robertson went to the bar and called for a taxi, then returned to the smoking area and told defendant, "I called you guys a cab. You need to leave." Defendant became belligerent, pointing at Robertson and calling her a "bitch," and refusing to leave despite Robertson's continued requests that she do so. Robertson tried to get defendant out of the bar, telling her, "You've got to go; you have to go." Defendant refused.

Helle and Justin moved in front of Robertson in "a protective mode" and told Robertson to back away to make sure nothing happened to her. Helle and Justin told defendant to leave. Defendant became more aggressive toward Robertson, lunging and swinging at her, and bumping up against Justin and Helle trying to get at her. Defendant

3

eventually struck Robertson, at which point Justin told defendant, "You've got to go." He maneuvered himself behind defendant, grasped her around the elbows (in what the trial court described as "like a bear hug kind of," leaving defendant's lower arms free-- "nothing that was hurting her, just like 'let's go, we need to leave' "--as he tried to "[herd]" her out of the bar.

Defendant cursed and flailed her arms, resisting Justin's attempts to shepherd her out of the bar. As they headed toward the door, defendant picked up a 10-ounce glass that was sitting on a nearby table, turned around and hit Justin in the head with it, leaving a deep gash in Justin's forehead and causing both he and defendant to stumble. According to Justin, defendant "just went to dead weight because she realized I wouldn't be able to move her and just dropped right in front of the door."

As Helle helped Justin, who was bleeding profusely from his forehead, Semone and Chris moved defendant away from Justin and out the door of the bar. Once outside, however, defendant turned back around and lunged at Semone, grabbing her hair as the two went to the ground inside the bar. Both women were entangled on the floor, and each had a hold of the other's hair and was calling the other names. Semone said, "Let go, let go." Robertson tried to break them up as she was on the telephone with the police, as did others in the bar. Defendant's female friend slapped Robertson in the face. The two eventually became disentangled and defendant was escorted outside the bar. She continued to yell and scream and tried to get back inside.

Defendant eventually got into a taxi cab. Redding Police Officers Veilleaux, Landreth, and Denham arrived at the bar. Officer Landreth approached the taxi and asked defendant for her I.D. Defendant refused. Officer Landreth informed defendant she was delaying or obstructing him in the course of his duty, a crime for which she would be arrested. Defendant responded, "Take me to jail." Officers Landreth and Veilleaux attempted to forcibly remove defendant from the taxi and place her in handcuffs. Defendant, who was yelling and "near hysterical," resisted by flailing her

4

arms and attempting to keep her hands in front of her. Helle recalled hearing defendant yell, "I didn't do anything." Eventually, defendant was handcuffed. She continued to resist and shout angrily at the officers.

Defendant yelled and struggled to pull away as Officers Denham, Veilleaux and Landreth walked her toward Landreth's patrol car. Officer Landreth informed defendant she was under arrest. Defendant jumped up and kicked the front headlight of the patrol car. As she continued to verbally and physically resist, the officers walked her to the door of the patrol car, where she was instructed several times to sit down on the rear seat. Defendant refused, and spat in Officer Denham's face. The officers took defendant to the ground, kicking and screaming, put leg restraints and a spit hood on her, and placed her on the rear seat of the patrol car.

LEGAL PROCEEDINGS

Defendant was charged with assault with a deadly weapon or by means likely to produce great bodily injury (Pen. Code § 245, subd. (a)(1); further unspecified references are to the Penal Code), battery on a peace officer (§ 243, subd. (b)), resisting an officer (§ 148, subd. (a)(1)), and public intoxication (§ 647, subd. (f)). The information alleged that she personally inflicted great bodily injury during the commission of the assault (§§ 1192.7, subd. (c)(8), 12022.7).

At defendant's request and over the prosecution's objection, the trial court instructed the jury on self-defense with CALCRIM No. 3470 in pertinent part as follows: "Self-defense is a defense to Count 1, the charged crime of assault with a deadly weapon or force likely to produce great bodily injury or the lesser included offense of assault, . . . . The defendant is not guilty of those crimes or lesser included offenses if she used force against the other person in lawful self-defense. [¶] The defendant acted in lawful self-defense if, first, the defendant reasonably believed that she was in imminent danger of suffering bodily injury or was in imminent danger of being touched unlawfully;

5

two, the defendant reasonably believed that the immediate use of force was necessary to defend against that danger; and third, the defendant used no more force than was reasonably necessary to defend against that danger."

The court further instructed the jury on self-defense with CALCRIM No. 3472 as follows: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force."

The jury found defendant guilty on all counts, but found not true the great bodily injury enhancement. The trial court denied defendant's motion to reduce the assault conviction to a misdemeanor, placed her on probation for three years, and ordered her to serve 90 days in the Shasta County jail.

DISCUSSION

Defendant contends the trial court prejudicially erred and violated her constitutional rights when it instructed the jury with CALCRIM No. 3472 on the concept of contrived self-defense. Defendant avers the instruction was not supported by the evidence and was possibly misapplied by the jury.

Although defendant concedes she did not object to the instruction at trial, we nonetheless address her contention because she claims her substantial rights were affected. (§ 1259; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1192-1193; *People v. Flood* (1998) 18 Cal.4th 470, 482, fn. 7.) In doing so, we note that "substantial rights" are equated with error resulting in a miscarriage of justice under *People v. Watson* (1956) 46 Cal.2d 818. (*People v. Arredondo* (1975) 52 Cal.App.3d 973, 978.)

In assessing a claim of instructional error, "we consider the instructions as a whole, in light of one another, and do not single out a word or phrase, and ' "assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." ' [Citation.]" (*People v. Holmes* (2007) 153 Cal.App.4th 539, 545-546.) We ask whether there is a reasonable likelihood the jury misconstrued or

6

misapplied the law in light of the instructions given, the entire record of the trial and the arguments of counsel.  (*People v. Fiu* (2008) 165 Cal.App.4th 360, 370.)

There was no instructional error here.  The instruction is supported by the evidence that, when Robertson took defendant's drink away from her, defendant called Robertson and "bitch" and yelled other profanities at her.  A reasonable jury might conclude that, in so acting, defendant intended to provoke a physical response to which she could respond in kind.

On these facts, the court reasonably determined CALCRIM No. 3472 was appropriate.  "A trial judge's superior ability to evaluate the evidence renders it highly inappropriate for an appellate court to lightly question his determination to submit an issue to the jury.  A reviewing court certainly cannot do so where, as here, the trial court's determination was agreeable to both the defense and the prosecution."  (*People v. McKelvy* (1987) 194 Cal.App.3d 694, 705.)

Defendant argues there is no evidence she provoked a fight or initiated a quarrel *with Justin*.  Defendant reads CALCRIM No. 3472 too narrowly.  The instruction requires that she "provoke[] a fight or quarrel with the intent to create an excuse to use force."  It does not require that defendant provoke a fight specifically with the person she claims she fought against in self-defense.  One may not provoke another, thereby creating a general melee and then reasonably claim that she has the right to self defense because she did not directly provoke the person with whom she ended up fighting.

Relying on *People v. Conkling* (1896) 111 Cal. 616 (*Conkling*), a case decided in the late 19th century, defendant argues the conflict between herself and Robertson cannot be used to foreclose her claim of self defense against Justin.  As we will explain, the limited facts in *Conkling* are not helpful here.

In *Conkling*, the decedent had blocked off a road that ran across his leased land.  The defendant, having been accustomed to traveling across the land to and from the post office and trading station, confronted and argued with the decedent when the decedent

7

stopped him and prevented him from continuing his journey. Several days later, the defendant, armed with a rifle, tore down the fence and traveled the road to the post office. On his return later that afternoon, he encountered the victim, whom he shot and killed. (*Conkling*, *supra*, at pp. 619-620.) There were no witnesses to the final confrontation, nor was there evidence regarding whether the defendant or the victim was the initial aggressor. The defendant admitted shooting the decedent but claimed self-defense. (*Id.* at pp. 620-621.)

It is true the jury instruction given in *Conkling* suggested that the defendant might have forfeited his right to defend himself by his conduct preceding the killing. Reversing on this ground, among others, the Supreme Court explained: "[The instruction] says in effect that, if the necessity for the killing arose by the fault of defendant, then the killing was not done in self-defense; and, again, it says if the danger which surrounded defendant was one brought upon himself by his own misconduct he cannot defend himself against it. Aside from any question as to the immediate cause which at the time of the killing precipitated the affray, this language of the instruction is broad enough to justify the jury in believing that it was such a fault or misconduct upon the part of the defendant, in attempting to travel this road under existing circumstances, as to deprive him of the right of self-defense if attacked by deceased at the point where the road was obstructed. Such, certainly, is not the law, and neither court nor counsel for the people would so contend." (*Conkling*, *supra*, 111 Cal. at pp. 625-626.)

Defendant avers that she, like Conkling, retained the right to defend herself "from [Justin] Bassett's physical attack." We disagree. In *Conkling,* the initial argument occurred days prior to the final confrontation. Because the jury heard very little evidence about what took place during that final confrontation other than the defendant's claim that he shot and killed the decedent in self-defense, there was reason to be concerned that the jury might misapply the challenged instruction by finding that whatever unknown threat surrounded the defendant during the final confrontation was the result of his own

8

misconduct hours if not days prior. Thus, under the evidence before the jury, the given instruction wrongly suggested that "the party first at fault -- the one beginning the affray -- absolutely forfeits to the other his right to live, to the extent at least of the difficulty which he has created. Having committed the first wrongful act, the plea of self-defense is foreclosed to him, and his life is the penalty, no matter what turn the affray may subsequently take." (*Conkling, supra*, 111 Cal. at p. 626.)

There was no danger of that here. Defendant initiated the confrontation when she directed profane language at Robertson, then threw the drink at her and shoved her. Defendant's hostile and aggressive behavior against Robertson did not let up, even when Justin (and Helle) stepped in front of Robertson to protect her, or when Justin tried to prevent defendant from hitting Robertson (or anyone else) by restricting her upper arms and moving her toward the exit of the bar.

We are not persuaded by defendant's claim that Justin's actions constituted a "physical attack," as that characterization is inconsistent with all the testimony at trial. The evidence showed Justin positioned himself between defendant and Robertson in order to shield Robertson, but did not touch defendant until she struck Robertson, at which point he moved from in front of defendant to behind her, wrapping his arms around her upper arms in order to prevent her from striking out at Robertson, himself, or anyone else within arm's reach. There was no evidence to suggest Justin acted in an aggressive or hostile manner toward defendant or said or did anything other than attempt to prevent defendant from striking anyone as he moved her away from Robertson and tried to shepherd her out of the bar.

The evidence of defendant's initial hostility toward Robertson followed by defendant's relentless physical aggression toward Robertson and anyone trying to protect Robertson, i.e., Justin, was more than sufficient to justify giving CALCRIM No. 3472 in order to give the jury guidance regarding the right to self-defense.

9

Finally, we note that the jury was instructed to read CALCRIM No. 3472 in conjunction with all the other instructions. Those instructions included CALCRIM No. 3470 on self-defense. The jury was also admonished to apply only those instructions that pertained to the facts as they determined them. Thus, even if we were to conclude there was insufficient basis for giving CALCRIM No. 3472, we would not reverse because the jury is presumed to disregard an instruction if it finds the evidence does not support its application. (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1381; *People* v. *Adcox* (1988) 47 Cal.3d 207, 253 [absent a contrary indication in the record, we assume the jury followed the instructions given by the court]; *People v. Rosoto* (1962) 58 Cal.2d 304, 352 [we assume the jury followed an admonition].)

## DISPOSITION

The judgment is affirmed.

      HULL      , Acting P. J.

We concur:

     ROBIE     , J.

     HOCH     , J.